Ray K. CHERRY and John H. Hadley,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Ray K. CHERRY, John H. Hadley, A. G.
Harrold and Max B. Elliott, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

UNITED STATES of America,
Plaintiff,

v.

LORAINE PARK HOMES, a California
corporation, Flower Street Investments,
Inc., a California corporation, Ben Lo-
mond Homes, Inc., a California corpo-
ration, HAQ Investments, Inc., a Cali-
fornia corporation, Coast Investment
Company, a California corporation, Alo-
sta Corporation, a California corpora-
tion, Ray K. Cherry, John H. Hadley,
A. G. Harrold, and Max B. Elliott, De-
fendants.

Civ. Nos. 64–377, 64–378, 66–1163.

United States District Court
C. D. California.

Feb. 3, 1967.

**970**

Adam Y. Bennion, Mackay, McGregor & Bennion, Hilbert P. Zarky and Mitchell, Silberberg & Knupp, Los Angeles, Cal., for plaintiffs in Civ. 64–377 and Civ. 64–378, and defendants in Civ. 66–1163.

Manuel L. Real, U. S. Atty., and Loyal E. Keir and Jerry R. Stern, Asst. U. S. Attys., Los Angeles, Cal., for the United States.

## DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

HAUK, District Judge.

Two actions against the United States for refund of Federal corporate income taxes erroneously and illegally assessed, collected by the Government and overpaid by the individual taxpayer plaintiffs as shareholders and transferees of three dissolved corporations; and one counter-action by the United States against the said individual taxpayers, the three dissolved corporations and three holding companies who were the distributees of the assets of the dissolved corporations.

These controversies, consolidated for trial, arise over the proper tax treatment to be accorded to the taxpayers under a series of transactions whereby three predecessor corporations built and sold tract homes under long-term contracts of sale, reporting income on the installment basis; then, while the contracts of sale were still in force, the individual shareholders of these predecessor corporations sold their stock therein to three other successor corporate holding companies which thereupon liquidated the predecessor corporations, distributed the residential installment sales contracts and obligations by refinancing and deeding out the properties to the home buyers, and reported their income by applying a stepped-up tax basis tied to the purchase price of the stock.

In the first two actions, the individual taxpayers seek refunds totaling approximately $400,000, on the theory that under the applicable provisions of the Internal Revenue Code of 1954 then in force, and since the predecessor corporations were 80 percent subsidiaries of the successor holding companies when the predecessor corporations were liquidated and when the installment obligations were distributed to the successor holding companies, no gain or loss should have been recognized to the successor holding companies; and further, since no such gain or loss should have been recognized to the successor holding companies upon such liquidation and distribution, no gain or loss should be recognized to the predecessor corporations.

In the counteraction, the Government seeks recovery against the individual taxpayers and also against all of the defendants either directly or as transferees of

one another for the full amount of the refunds sought by the individual plaintiffs in their actions against the Government. But only in the event the individual taxpayers receive judgment under the first two actions does the Government press its counteraction.

After ten-day, non-jury trial the Court makes its decision, findings of fact and conclusions of law in favor of plaintiffs in the first two actions and of defendants in the counteraction, ordering judgment for the taxpayers and against the Government.

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs in No. 64-377-AAH Civil and No. 64-378-AAH Civil, and the Defendants in No. 66-1163-AAH Civil: | ADAM Y. BENNION and MACKAY, McGREGOR & BENNION, Los Angeles, California |
| | and |
| | HILBERT P. ZARKY and MITCHELL, SILBERBERG & KNUPP, Los Angeles, California |
| For the Defendant in No. 64-377-AAH Civil and No. 64-378-AAH Civil, and for the Plaintiff in No. 66-1163-AAH Civil: | MANUEL L. REAL, United States Attorney, and LOYAL E. KEIR and JERRY R. STERN, Assistant United States Attorneys, Los Angeles, California |

———◆———

The first two actions in this case were brought by the individual taxpayer plaintiffs against the United States for the recovery, by way of refund, of approximately $400,000 in Federal corporate income taxes which it is claimed were erroneously and illegally assessed and later collected by the Government and overpaid by the taxpayers as shareholders and transferees of three dissolved corporations. Jurisdiction is based on 28 U.S. C.A. § 1340 [1] and § 1346(a) (1) [2].

The third action, a sort of counteraction, virtually in the nature of a counterclaim or cross-claim, is brought by the United States against the aforesaid three dissolved corporations, against the same individual taxpayers as shareholders and transferees of the three dissolved corporations, and against three successor holding companies, as well as against the individual taxpayers and the three dissolved corporations as transferees of the successor holding companies. The Government seeks recovery of the identical sums which the individual taxpayers seek in their refund actions, but only in the event the refund actions are successful. In this counteraction, jurisdiction is based upon 28 U.S.C.A. § 1340 [3], and § 1345 [4] along

1. "§ 1340. Internal revenue; customs duties
    The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Customs Court."

2. "§ 1346. United States as defendant
    (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
    (1) Any civil action against the United States for the recovery of any internal-

revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;"

3. Footnote 1, supra.

4. "§ 1345. United States as plaintiff
    Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the

with 26 U.S.C.A. § 7401 [5] and § 7402(a) [6], the alleged transferee liability being founded upon 26 U.S.C.A. § 6901(a) (1) [7]

The tax controversies of these three actions, consolidated for trial, arose from the fact that three corporations, namely Loraine Park Homes, Ben Lomond Homes, Inc., and Coast Investment Company (sometimes, for convenience, called the predecessor corporations), had built and sold tract homes to purchasers under long-term contracts of sale and had reported their income on the installment basis. At a time when each of the predecessor corporations still had unreported installment income, the shareholders, desirous of obtaining capital gain treatment, sold their shares of stock to new corporate entities, namely Hartford Builders, Inc. (which later sold to Flower Street Investments, Inc.), HAQ Investments, Inc., and Alosta Corporation, (sometimes, for convenience, called the successor corporations or holding companies). The successor holding companies promptly proceeded to liquidate their newly acquired subsidiaries and, thereafter, made a disposition of the remaining installment obligations in a manner more fully described hereafter. The successor corporations thereupon reported their income by applying to these installment obligations a new stepped-up tax basis tied to the price of the stock. The United States seeks to hold the predecessor corporations (and their former shareholders as transferees) for increased tax liabilities on the theory that the predecessor corporations should be taxed with the full amount of the installment obligations not previously taxed. Alternatively, it seeks to hold the successor holding companies (and the former stockholders of the predecessor corporations as alleged transferees of the successor corporations) for increased tax liabilities on the theory that the successor corporations did not acquire a new stepped-up tax basis in the assets which they acquired upon liquidation of their subsidiaries.

The individual taxpayer plaintiffs contend that, under the applicable provisions of the Internal Revenue Code of 1954 in force at all times material to the litigation, they are entitled to recover the overpaid taxes. Relying upon Section 332 of the Code [8], they assert that the

United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

5. "§ 7401. Authorization
No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary or his delegate authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced."

6. "§ 7402. Jurisdiction of district courts
(a) To issue orders, processes, and judgments.—The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction, and of *ne exeat republica*, orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws."

7. "§ 6901. Transferred assets
(a) Method of collection.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:
(1) Income, estate, and gift taxes.—
(A) Transferees.—The liability, at law or in equity, of a transferee of property —
(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),"

8. "§ 332. Complete liquidations of subsidiaries
(a) General rule.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.
(b) Liquidations to which section applies.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—
(1) the corporation receiving such property was, on the date of the adop-

predecessor corporations were 80 percent subsidiaries of the successor holding companies when the predecessor corporations were liquidated and when the tract home contract sale installment obligations were distributed to the successor holding companies; and that, therefore, no gain or loss should have been recognized to the successor holding companies.

Then turning to Section 453(d) (4) (A) [9] they contend that since no gain or loss should be recognized to the successor holding companies upon such liquidation and distribution, it follows that no gain or loss should be recognized to the predecessor corporations.

The Government on the other hand contends that the predecessor corporations, and therefore the individual taxpayers as transferees thereof, were properly taxed because the transactions between the predecessor corporations, the individual taxpayers as shareholders and transferees, and the successor holding companies were sham, and that the successor holding companies were mere funnels or conduits through which the installment obligations owned by the predecessor corporations flowed into the hands of the refinancing agencies—California Federal Savings and Loan Association of Los Angeles, and Mutual Savings and Loan Association of Pasadena—resulting in tax avoidance or tax evasion schemes that provided the form but not the substance of actual stock sales and liquidations which, says the Government, were in truth and in fact mere contrivances to bail out corporate earnings at capital gains rates and were, therefore, within the interdiction of Section 269 of the Revenue Code denying tax allowances in corporate acquisitions made to evade or avoid income tax.[10]

Upon this theory, the Government in its counteraction seeks recovery of the full amount of any tax refund that the individual taxpayers may recover in their

---

tion of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends);"

9. "§ 453. Installment Method

&ast; &ast; &ast; &ast; &ast;

(d) Gain or loss on disposition of installment obligations.—

&ast; &ast; &ast; &ast; &ast;

(4) Effect of distribution in certain liquidations.—

(A) Liquidations to which section 332 applies.—If—

(i) an installment obligation is distributed by one corporation to another corporation in the course of a liquidation, and

(ii) under section 332 (relating to complete liquidations of subsidiaries) no gain or loss with respect to the receipt of such obligation is recognized in the case of the recipient corporation,

then no gain or loss with respect to the distribution of such obligation shall be recognized in the case of the distributing corporation."

10. "§ 269. Acquisitions made to evade or avoid income tax

(a) In general. If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation."

two actions. Alternatively, the Government seeks to recover taxes from the successor holding companies (as well as the predecessor corporations as transferees of the successor holding companies and the individual taxpayers as transferees of both) on the theory that the successor holding companies did not acquire a new stepped-up tax basis in the assets (including the residential contract sale installment obligations) which were distributed to them in the liquidation of their subsidiary predecessor corporations.

The Government argues that Section 334(b) (2) of the Internal Revenue Code [11] does not apply because, again, the taxpayer transactions are all sham, mere conduits or funnels or contrivances setting up the form but not the substance of actual stock sales and liquidations, and constitute tax evasions or avoidances within the meaning of Section 269 of the Code.

There are two essential and closely allied factual issues in these cases; once they have been resolved, the application of the pertinent provisions of the Internal Revenue Code seems clear and unquestionable. Those questions are:

1. Did the predecessor corporations intend to, attempt to, or actually, whether directly or indirectly, dispose of their installment obligations (by borrowing the full amount of their equities in the properties and causing the properties to be deeded to the homeowners)?

2. Did the shareholders of the predecessor corporations make a real, actual genuine and *bona fide* sale of their shares of stock to the successor corporations (and was disposition of the installment obligations accomplished only by the successor corporations)?

Since these fact questions are closely allied, the record evidence relating to both will be discussed together.

Although it is plain that the predecessor corporations could have disposed of their installment obligations by refinancing the residential properties with the savings and loan institutions, thereby incurring an immediate tax on their deferred profits, the record evidence is undisputed that, if this had been the only available choice, they would have refrained from exercising it since not only did they desire to avoid a costly accelerated tax burden which would attend such an immediate realization of income, but there were additional business reasons why the predecessor corporations would otherwise have retained those installment obligations. By retaining the contracts, they would continue to earn added profits because of a spread between the interest collected from the homeowners and the interest paid to the savings and loan

---

11. "§ 334. Basis of property received in liquidations

\* \* \* \* \*

(b) Liquidation of subsidiary.—

\* \* \* \* \*

(2) Exception.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a period of not more than 12 months, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items."

institutions, and because of other charges sometimes collected from the homeowners.

There is no evidence that the predecessor corporations intended to dispose of their installment obligations in .. taxable transaction. On the contrary, the uncontradicted evidence shows, affirmatively, that the predecessor corporations did not intend to make such a disposition.

While the shareholders of the predecessor corporations, acting principally through the plaintiff Ray K. Cherry, did make active inquiry of Mr. Neelley of California Federal Savings & Loan Association regarding the possibility of a refinancing of the properties, all of the testimony and all of the pertinent, contemporaneous documentary evidence makes it overwhelmingly clear that such inquiries were being made, not on behalf of the predecessor corporations or because these corporations were interested in obtaining refinancing, but only because the shareholders were interested in selling their shares of stock, consistent with the tax advice previously received; and because, acting as prudent business people, they wanted to know what a purchaser of their shares of stock could reasonably expect.

Where a closely held corporation is involved, there can always be a question whether the activities of the persons who are the shareholders, officers and directors are being conducted on behalf of the corporation and, consequently, are corporate activities; or whether the individuals are acting on their own, personal behalves. The plain teaching of United States v. Cumberland Public Service Co., 338 U.S. 451, 453–455, 70 S.Ct. 280, 94 L.Ed. 251 (1950) is that, even with respect to corporate asset which they intend to receive on a corporate liquidation, the individual shareholders can act on their own, and that their individual activities are not to be ascribed to the corporation and do not subject the corporation to a taxable transaction.

Of course, when a corporation has embarked on a transaction which, when consummated, would result in a taxable event at the corporate level, and the shareholders later attempt to consummate the transaction on their own behalves, rather than on behalf of the corporation, the entire factual picture, reinforced by the obvious attempt to backtrack and to shift taxable entities in mid-action, can lend credence to the conclusion that the corporation is in reality the taxable entity which is acting and to which the taxable transaction should be ascribed. Such was the situation in Commissioner v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945) and in Blueberry Land Co., Inc. v. C. I. R., 361 F.2d 93 (5th Cir. 1966), upon which the United States places its overwhelming reliance in the case before us.

Here, however, the evidence is overwhelmingly clear that the predecessor corporations never intended to have and actually did not have involvement in the refinancing; it is also clear that the individual taxpayers were acting in their individual capacities, consistently with their intention to sell their shares of stock in the predecessor corporations.

It should be stated and Government counsel now admit that the record contains no support for the thesis originally advanced by the Government that California Savings and Loan Association and Mutual Savings and Loan Association had entered into legally binding obligations with the predecessor corporations to refinance the residential properties.

There are at least two reasons why this contention fell in the face of the facts developed at the trial and must be rejected. First of all, the witness Neelley made it plain that the so-called moral "commitments" to Ray Cherry regarding the refinancing of the properties were no more than statements of intent and were to be distinguished from written commitments for which a fee is charged and which are intended to be and actually are legally enforceable. These commitments or assurances, moreover, were made to Cherry, in his individual capacity, not to the predecessor corporations nor to Cherry as an officer or director thereof, and were made on the supposition that the increased loans would be applied for and

obtained by successor corporate entities which actually purchased the shares of stock in the predecessor corporations.

Secondly, the witnesses from Mutual Savings and Loan also testified that the commitment that Mutual made was for such a successor corporation. To be sure, in the then prevailing conditions of the money market, the possibilities were overwhelming that the increased loans would be made to the successor corporations. But the legal risk (however small the practical risk) that the lending institutions would, because of a change in the money market or because of any reason or no reason at all, refuse to follow through on the prior commitment or statement of intent, fell on the successor corporations, as the purchasers of the stock of the predecessor corporations.

No matter from what aspect it is approached, the trial record evidence is convincing that the shareholders of the predecessor corporations made a *bona fide*, actual and genuine sale of their shares of stock to the successor corporations. True, the shareholders of the successor corporations were also the attorneys and tax advisors for the predecessor corporations and the plaintiffs; and, admittedly, the parties were motivated by a desire to minimize the tax burden of the predecessor corporations and to achieve a single, capital gains tax for the plaintiffs as selling shareholders.

The circumstances invite close scrutiny; standing alone, these facts might well lead to a strong inference that the stock sales were not *bona fide,* actual and genuine, but were mere sham transactions or superficial formalities designed to obscure the fact that the successor corporations were acting as mere conduits or agents for the predecessor corporations and their shareholders. But no such inference can legitimately stand in the light of the affirmative, uncontradicted record of the trial.

The attorneys and shareholders in the successor corporations, Messrs. Axelrad and Quirk, were thoroughly credible and unimpeachable witnesses and both testified that they were acting, not as attorneys or agents, but as investors interested in making profits. Their testimony was confirmed by the uncontradicted evidence given by Cherry. And the successor corporations, indeed, acted as real, actual, genuine, *bona fide* and viable entities intent on making profits.

Once the successor corporations acquired the stock of the predecessor corporations, the plaintiffs did not attempt to, nor did they in fact, in any way control the actions of the successor corporations or their shareholders. The successor corporations, after acquiring the stock brought about a real, actual, genuine and *bona fide* liquidation of the predecessor corporations. As the then owner of the properties, they took all the necessary action to obtain the increased financing and to engage in legitimate corporate activities. None of the profits earned by the successor corporations ever inured to the benefit of the shareholders of the predecessor corporations nor did the predecessor corporate shareholders assume or share in any of the risks incurred by the successor corporations.

Notwithstanding the voluminous documentary evidence and the extensive testimony of witnesses throughout the ten-day trial, and despite the intensive discovery proceedings which were conducted, the Government was unable to produce any evidence which would support or tend to lend credence to the theory that the transactions were sham, unreal or artificial, or that the successor corporations acted as mere conduits, tools or agents.

While there was strong tax motivation throughout, the objective being to secure a capital gains tax to the selling shareholders while avoiding a tax to the predecessor corporations on their deferred installment obligations, and while the successor corporations were intent on obtaining a new tax basis for these installment obligations on the liquidation of their newly acquired subsidiaries, such tax motivation does not, of itself, require the conclusion that the tax consequences are to be determined by what the parties could have done rather than by the course

of action which they deliberately chose and actually followed.

To the contrary, so long. as the actions of taxpayers are not mere sham, window dressing or disguise and so long as the taxpayers act in a substantive manner, the tax consequences are to be determined by what they did actually do, not by what they could have done. And it matters not that they were fully aware that they chose a course of conduct deliberately designed to minimize their tax burden. United States v. Cumberland Public Service Co., 338 U.S. 454, 455, 70 S.Ct. 280, 282, 94 L.Ed. 251 (1950) [12]. See also: Commissioner v. Brown, 380 U.S. 563, 572, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); Hanover Bank, Executor v. Commissioner, 369 U.S. 672, 687, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962); Samson Tire & Rubber Corp. v. Rogan, 136 F.2d 345, 347, (9th Cir. 1943); C. I. R. v. South Lake Farms, Inc., 324 F.2d 837, 840 (9th Cir. 1963); Granite Trust Co. v. United States, 238 F.2d 670, 675 (1st Cir. 1956).

Any other conclusion would be opposed to the realities of the business world for, faced with the intricacies of the incredibly complex taxing statutes, prudent businessmen do not normally move without first consulting their tax advisors.

Thus, in the present situation, the fact that the predecessor corporations would have incurred a corporate tax on their deferred installment obligations, had they made a disposition of these obligations by refinancing and deeding out the properties, does not mean that they can be taxed in this manner simply because the motivation was to avoid such a tax. This motivation is not of significance, except insofar as it might sometimes, in more dubious circumstances, cast light on what the parties really did do. As was aptly said in Kraft Foods Company v. Commissioner, 232 F.2d 118, 128, (2nd Cir. 1956): "The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact." In the present cases, where the facts are overwhelmingly clear as to what was done, the relevant provisions of the Internal Revenue Code must be applied to the facts which actually did transpire and the acts which actually were done, tax motivation aside.

The only disposition of installment obligations made by the predecessor corporations took place after the individual taxpayer-shareholders had sold their shares of stock therein to the successor corporations and such disposition took place in the course of real, actual, genuine and *bona fide* liquidations by the then successor parent corporations. The applicable statutory provision is Section 453 (d) (4) (A) of the Internal Revenue Code which, as it read during the taxable years in controversy, provided in pertinent part as follows:

"(A) Liquidations to which section 332 applies.—

If—

(i) an installment obligation is distributed by one corporation to another corporation in the course of a liquidation, and

(ii) under section 332 (relating to complete liquidation of subsidiaries) no gain or loss with respect to the receipt of such obligation is recognized in the case of the recipient corporation,

then no gain or loss with respect to the distribution of such obligation shall be recognized in the case of the distributing corporation."

The plain language of the statute requires a holding that the predecessor cor-

---

12. Mr. Justice Black, writing for a unanimous Supreme Court:

"Here, on the basis of adequate subsidiary findings, the Court of Claims has found that the sale in question was made by the stockholders rather than the corporation. The Government's argument that the shareholders acted as a mere 'conduit' for a sale by respondent corporation must fall before this finding. The subsidiary finding that a major motive of the shareholders was to reduce taxes does not bar this conclusion. Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes."

porations did not make a taxable disposition of their installment obligations. Nor is there anything in the statute to indicate that an opposite conclusion would be appropriate simply because the predecessor corporations had previously disposed of or had sold all their other properties and owned only installment obligations at the time of their liquidation. A parallel situation was involved in Bijou Park Properties, Inc. v. Commissioner, 47 T.C. No. 19 (decided November 28, 1966) CCH Tax Ct. Rptr. 2895 (1966) and the Tax Court there similarly held that on the liquidation by a parent corporation of its newly acquired subsidiary corporation, the subsidiary did not make a taxable disposition of its installment obligations (which, like here, resulted from sales of real estate under long-term contracts of sale) in distributing them to the parent upon liquidation, even though all its other properties were previously sold and even though its only assets consisted of such installment obligations. We agree with the Tax Court in *Bijou* that the conclusion reached there and in the present cases is dictated by the "scalpel-like precision with which Congress has fashioned the applicable statutory provisions".[13]

Moreover, a recent Amendment to Section 453(d) (4) (A)—Public Law 89–809, 80 Stat. 1539, Section 202(c) and (d), 89th Cong., 2d Sess., approved November 13, 1966 [14]—confirms our conclusion that the liquidations and distributions of installment obligations involved in the actions before the Court here are not taxable. This Amendment, as *Bijou* [15] points out, provides only *prospectively* that a distribution of installment obligations in a Section 334(b) (2) liquidation constitutes a taxable disposition by the distributing corporation.

The legislative history of this Amendment is most enlightening. It indicates to this Court beyond any doubt that the purpose was "to eliminate the tax avoidance possibility under present law" by providing that in the future, that is, after the effective date of the Amendment and in connection with transactions occurring after November 13, 1966, the then existing tax loophole, which worked and still works to the advantage of taxpayers in the present case before this Court, should be closed. The Amendment provides that, in the future, installment notes transferred to a holding company in liquidation of a subsidiary should be treated as "disposed of" and therefore resulting in gain to the distributing corporation in the same manner as if it had sold the notes, when the holding company receives a stepped-up basis for the notes.

This Amendment, P.L. 89–809, Sec. 202 (c) and (d), started out in Congress as H.R. 18230, in language identical to the final enactment. It was accompanied by a Report of the House Ways and Means

---

13. Bijou Park Properties, Inc. v. Commissioner, 47 T.C. No. 19, p. 18 (Nov. 28, 1966), CCH Tax Ct. Reptr., 2895, 2900 (1966).

14. Vol. 1, U.S. Code Congressional and Administrative News 1966, pp. 1776, 1821–1822; 35 U.S. Law Week, 49, 61; C.C.H. Tax Rep., Int.Rev.Code, pp. 4165–4166:

"SEC. 202. BASIS OF PROPERTY RECEIVED ON LIQUIDATION OF SUBSIDIARY.

\* \* \* \* \*

"(c) Distribution of Installment Obligations.—Section 453(d) (4) (A) (relating to distribution of installment obligations in certain liquidations) is amended to read as follows:

'(A) Liquidations to which section 332 applies.—If—

'(i) an installment obligation is distributed in a liquidation to which section 332 (relating to complete liquidations of subsidiaries) applies, and

'(ii) the basis of such obligation in the hands of the distributee is determined under section 334(b) (1), then no gain or loss with respect to the distribution of such obligation shall be recognized by the distributing corporation.'

"(d) Effective Dates.— \* \* \* The amendments made by subsections (b) and (c) shall apply only with respect to distributions made after the date of the enactment of this Act."

15. Bijou Park Properties, Inc. v. Commissioner, 47 T.C. No. 19, p. 18 (Nov. 28, 1966) CCH Tax Ct. Reptr., 2895, 2900 (1966).

Committee [16] which contains the following explanation of the proposed Amendment (emphasis ours):

*"Installment notes.*—When one corporation buys more than 80 per cent of the stock of another within 12 months and causes the corporation acquired to be liquidated within 2 years of the last acquisition of stock, the basis of the assets acquired is the amount paid for the stock (properly allocated). In such a case, generally no gain is recognized to the distributing corporation (unless it is a corporation which elected 341(f) treatment to avoid danger of being treated as a collapsible corporation, or unless the sections dealing with the recapture of depreciation apply).

"If the property received on a liquidation of the type described above (to which sec. 334(b) (2) applies) consists of installment notes, *then the gain which would normally be taxed on the sale or collection of such notes may, in whole or in part, permanently escape income taxation.* This would result if the basis of such notes were raised to the amount paid for them by the acquiring corporation even though no gain were recognized to the distributing corporation.

*"This bill eliminates the tax avoidance possibility under present law* by providing that installment notes transferred in a liquidation of the type described above are to be treated as 'disposed of' for purposes of the installment sale provision (sec. 453 (d)). Accordingly, gain is to be recognized to the distributing corporation, in the same manner as if it had sold the notes.

"This provision is effective with respect to distributions made after the date of enactment."

It will be noted that the House was concerned that under the then existing law, gain which would normally be taxed on the sale or collection of installment notes received in 334(b) (2)-type liquidations was permanently escaping income taxation, and it proposed this bill in order to "eliminate the tax avoidance possibility under present law".

In the Senate, the House Bill H.R. 18230 was tacked onto the so-called Foreign Investors Tax Act of 1966 [17], accompanied by Senate Report No. 1707 of October 11, 1966, 89th Cong., 2d. Sess., which at pp. 60–61 [18] incorporated, on behalf of the Senate, the deep concern of the House that existing law permitted gain upon installment notes received in 334(b) (2) liquidations to permanently escape income taxation. And it, recommended enactment of the Amendment, stating that: "Existing law may be adequate to deal with certain types of situations" and using this language as a substitute for the House Report's statement that "this bill eliminates the tax avoidance possible under present law." [19]

---

16. House Report No. 2273, 89th Cong., 2d Sess., October 13, 1966, pp. 2–3.

17. H.R. 13103, 89th Cong. 2d Sess., Vol. 1, U.S. Code Congressional and Administrative News 1966, pp. 1776, 1821–1822.

18. Vol. 3, U.S. Code Congressional and Administrative News 1966, pp. 4446 at 4506–4507.

19. Senate Report No. 1707, 89th Cong., 2d Sess., pp. 60–61 (Oct. 11, 1966) ; Vol. 3, U.S. Code Congressional and Administrative News 1966, pp. 4446, 4506–4507 (emphasis added) :

*"Installment Notes.*—When one corporation buys more than 80 percent of the stock of another within 12 months and causes the corporation acquired to be liquidated within 2 years of the last acquisition of stock, the basis of the assets acquired is the amount paid for the stock (properly allocated). In such a case, generally no gain is recognized to the distributing corporation (unless it is a corporation which elected 341(f) treatment to avoid danger of being treated as a collapsible corporation, or unless the sections dealing with the recapture of depreciation apply). If the property received on a liquidation of the type described above (to which sec. 334(b) (2) applies) consists of installment notes, *then the gain which would normally be taxed on the sale or collection of such notes may, in part or in whole, permanently escape income taxation.* This would result if the basis of such notes were raised to the amount paid for them

The Conference Report No. 2327 of both the House and the Senate, October 19, 1966, 89th Cong., 2d Sess., p. 8,[20] adopts and confirms the Senate Report for description of the changes which the Amendment makes in existing law.

From this legislative history it is impossible to conclude other than that Congress was concerned about the fact that existing law prior to November 13, 1966 —the law governing the case and the actions now before the Court, permitted these transactions we have before us here to result in perfectly legal tax avoidance. The Amendment was passed to eliminate this tax avoidance but it was not made retroactive. It applies only prospectively by the very terms of the Amendment itself, section 202(d) Public Law 89–809.[21]

Since Congress has not seen fit to apply it to prior transactions which were resulting in installment obligations escaping taxation in 334(b) (2)-type liquidations, it certainly is not within the province of this Court to do so. We do not do so. In fact, we cannot do so because we are not legislators. And as a result it is perfectly plain that in the case before the Court no taxable disposition of their installment obligations was ever made by the predecessor corporations when they distributed these installment obligations to their successor holding companies upon liquidation.

The decision of the Tax Court and the affirming opinion of the Court of Appeals in Blueberry Land Co., Inc. v. C. I.

R,.[22] are not opposed to the result here being reached or to the result in *Bijou Park Properties, Inc.*[23] In *Blueberry,* because the corporation desired to dispose of its installment obligations and had taken appropriate corporate action to effectuate that purpose, a last minute and hastily devised effort to disguise the transaction by a purported stock sale to a transitory corporation was held not to alter the true nature of what actually took place. The *Blueberry* situation, as already has been noted, was essentially the same as was involved in Commissioner v. Court Holding Company [24]. Here, however, in the case now before us, just as in *Bijou,* there were *bona fide,* actual, genuine and real sales of stock followed by *bona fide,* actual, genuine and real liquidations.

The taxes which are the subject of the refund suits here were exacted from the individual stockholders of the predecessor corporations on the ground that the taxpayers were liable as transferees of the obligations of these predecessor corporations. The theory of the Government, relative to transferee liability, was that the sales of stock were sham transactions, designed to disguise the true nature of what transpired. But, since the trial record of the evidence fails to support such a theory, there is no basis on which transferee liability can be imposed, regardless of the correctness of the conclusion in *Bijou* and here that Code Section 453(d) (4) (A) (prior to the Amendment) did

---

by the acquiring corporation even though no gain were recognized to the distributing corporation.

"*Although existing law may be adequate to deal with certain types of situations,* your committee believes that gain should generally be recognized by the distributing corporation in all cases in which the acquiring corporation receives a new basis in the installment notes. The amendment provides that installment notes transferred in a liquidation of the type described above are to be treated as 'disposed· of' for purposes of the installment sale provision (sec. 453(d)). As a result, gain is to be recognized to the distributing corporation, in the same manner as if it had sold the notes.

"This amendment is effective with respect to distributions made after the date of enactment."

20. Vol. 3, U.S. Code Congressional and Administrative News 1966, pp. 4526, 4527.

21. Vol. 1, U.S. Code Congressional and Administrative News 1966, pp. 1776, 1821–1822.

22. 361 F.2d 93 (5th Cir. 1966).

23. Bijou Park Properties, Inc. v. Commissioner, 47 T.C. No. 19 (Nov. 28, 1966), CCH Tax Ct. Reptr., 2895 (1966).

24. 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945).

not equate a liquidation of a subsidiary with a taxable disposition of its installment obligations. Thus, if, somehow, Section 453(d) (4) (A) could be read differently than what its plain language states, so that the predecessor corporations could properly be held to have made a taxable disposition of their installment obligations either when they transferred their assets to the successor corporations or when the successor corporations obtained the increased financing, the taxable event would have taken place *after* the plaintiffs-shareholders had actually *sold* their shares to the successor corporations. In *such circumstances*, having sold their shares of stock and having received no assets from the predecessor corporations, they cannot be held liable, as transferees, for the tax liabilities of the predecessor corporations. See: Boss v. United States, 290 F. 167 (9th Cir. 1923); W. S. Dudley v. Commissioner, 15 B.T.A. 570 (1929); J. T. S. Brown's Son Company v. Commissioner, 10 T.C. 840 (1948); Gaines v. Commissioner, par. 53,157 P–H Memo. T.C. (1953); Lester L. Robison v. Commissioner, 22 B.T.A. 395 (1931); Motter v. Patterson, 68 F.2d 252 (10th Cir. 1933); Commissioner v. Southern Bell Telephone & Telegraph Co., 34 B.T.A. 540 (1936) aff'd, 102 F.2d 397 (6th Cir. 1939).

In reporting their taxable income, the successor corporations determined the gain realized on the disposition of the installment obligations (which they acquired on the liquidations of the predecessor corporations—the then wholly owned subsidiaries of the successor corporations) by allocating an aliquot portion of the purchase price paid for the stock to arrive at a stepped-up tax basis for those installment obligations. The Government, however, in the counteraction instituted by it, seeks to collect income tax deficiencies from the successor corporations on the theory that they were, on the contrary, required to use the same basis which the predecessor corporations had; and further seeks to hold the shareholders of the predecessor corporations as transferees of the increased tax liabilities being asserted against the successor corporations.

Code Section 334(b) (2) of the Internal Revenue Code provides in pertinent part as follows: [25]

"(2) Exception.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted— (i) on or after June 22, 1954, and (ii) not more than 2 years after the date of the transaction described in subparagraph (B) * * *; and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, * * * was acquired by the distributee by purchase * * * during a period of not more than 12 months,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. * * * *"

That section is, in part, a codification of a judicially formulated rule which is exemplified by the decision in Kimbell-Diamond Milling Company v. Commissioner, 14 T.C. 74, (1950) aff'd 187 F.2d 718 (5th Cir. 1951), cert. den. 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951).

The precise statutory requirements of Section 334(b) (2) have been met by the successor corporations in every respect, and they are required to determine the basis of the assets acquired from their subsidiary corporations in accordance with the provisions of that section upon the adjusted or stepped-up basis.

It is true, as the Government points out, that the deferred profit on the installment obligations, not previously taxed to the predecessor corporations, will, in

25. 26 U.S.C.A. 334(b) (2), *supra, footnote 11.*

part, escape taxation at the corporate level once the successor, parent corporations acquire a new basis determined by reference to the purchase price paid for the shares of stock acquired. But that is the inevitable result of the rule originally judicially fashioned by the courts and legislatively adopted by Congress in Section 334(b) (2) which treats the parent corporations as though they had purchased assets directly. In every situation where assets have appreciated in value or where potential items of income have not yet been subject to taxation under the provisions of the taxing statute, such items of potential gain or income will not be taxed once the successor corporation acquires a new tax basis.

But of course, the converse is also true, so that potential items of loss will confer no tax benefit when Code Section 334(b) (2) comes into play. Such was the situation in *Kimbell-Diamond*,[26] where it was the Government which urged the adoption of this rule. The identical rule must be applied uniformly, regardless of how the chips fall.

Nor is there anything in the statute which requires a differentiation between installment obligations and other corporate assets, tangible or intangible in nature. Indeed, in fashioning a solution to the "tax avoidance possibility under present law", the solution recently adopted by Congress in Public Law 89–809 which we have discussed at length, is to require that in the future the subsidiary be taxed with income on its installment obligations at the time of its liquidation; Congress did not seek a legislative solution by refusing a new basis to the acquiring corporation. Yet, the Government seeks such a solution here—a solution which would fly in the teeth of the clear and unambiguous language of Code Section 334(b) (2).

The Government contends, however, that the provisions of Code Section 269 can be applied to deny a new basis to the successor corporations. That section provides, in pertinent part, as follows: [27]

"(a) In general.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit or other allowance. * * *"

That section can have no application here for three distinct reasons.

Section 269 does not come into play unless control of a corporation has been acquired with the "principal purpose" of "evasion or avoidance" of Federal income tax. The evidence in the trial record here establishes beyond all doubt that the principal purpose for the acquisition of the predecessor corporations was to permit the successor corporations to make a profit and to engage in regular business activities. It was not by any stretch of the imagination pure tax evasion or avoidance.

Further, under Section 269 such evasion or avoidance must be by securing the benefit of a "deduction, credit or other allowance" which would not otherwise have been enjoyed. Under Code Section 336, no gain or loss is to be "recognized"

26. Kimbell-Diamond Milling Company v. Commissioner, 14 T.C. 74 (1950), aff'd 187 F.2d 718 (5th Cir. 1951), cert. denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951).

27. 26 U.S.C.A. 269, supra, footnote 10.

to a corporation when it distributes property to its shareholders in liquidation and under Section 453(d) (4) (A) no gain or loss is to be "recognized" on the distributions of installment obligations in the liquidation of subsidiary corporations. The term "recognized" like the term "realized" is a technical term used in many sections of the Internal Revenue Code, and has been used by Congress as a word of precise meaning. See 3 Mertens, Law of Federal Income Taxation (Zimet & Weiss rev. ed. 1965), Chapter 20, pp. 1–837. Likewise, the terms "deduction", "credit" and "allowance", as used in Section 269, are technical terms, each having its own precise meaning in the Internal Revenue Code. The point is that statutory provisions dealing with non-recognition of gain, as in Section 336 and 453(d) (4) (A), are not encompassed or rightfully described by the terms "deduction", "credit" or "allowance" and, quite plainly, Section 269 does not deal with nonrecognition concepts. See Nutt v. Commissioner, 39 T.C. 231, 250, (1962), rev'd on other issue, Nutt v. C. I. R., 351 F.2d 452 (9th Cir. 1965).

Finally, Section 269 deals only with deductions, credits or allowances "which such person or corporation would not otherwise enjoy". But, no matter how broadly the terms of Section 269 are construed, there is no benefit unless the acquiring corporations obtained a new basis in the assets of the predecessor corporations (including its installment obligations) under the *Kimbell-Diamond* rule of Code Section 334(b) (2). Since the situation with respect to which Congress was legislating was one where a purchasing corporation would be treated as having bought assets, even though it, in fact, bought stock, and since such acquisitions normally are made to achieve the very tax result which Congress intended, it cannot be said that here in the case before us, any benefits have been secured which the parties "would not otherwise enjoy". See Cromwell Corp. v. Commissioner, 43 T.C. 313, 317–322 (1964).

Since no grounds exist for holding that there is a deficiency in the taxable income of the successor corporations, the question of transferee liability becomes academic. However, even if the successor corporations were not entitled to use a new basis for the installment obligations under Code Section 334(b) (2) and even if there were deficiencies in the income tax liabilities of the successor corporations, there can be no transferee liability on the part of the shareholders of the predecessor corporations since they had no interest in and never received any of the assets of the successor corporations. While they received the purchase price for their shares of stock from the successor corporations, which was set at 90 percent of the value of the predecessor corporations' assets, there is no reason to believe that this price, determined as it was by arms' length bargain, was not a full and adequate consideration. See Commissioner v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965), supra. Consequently, the plaintiffs are not transferees of the successor corporations.

Based upon the foregoing, which shall and does constitute part of the findings of fact and conclusions of law required by Rule 52, Federal Rules of Civil Procedure, upon the authorities therein set forth, and upon the evidence in the trial record herein, the Court now makes its formal Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. These actions were consolidated for trial. The actions in Docket Nos. 64–377–AAH Civil and 64–378–AAH Civil are for the recovery of corporate income taxes which were assessed against and collected from the individual plaintiffs as alleged transferees of certain corporations. The plaintiffs in Docket No. 64–377–AAH Civil are Ray K. Cherry (hereinafter "Cherry") an individual who resides at 1494 Waverly Road, San Marino, California, and John H. Hadley (hereinafter "Hadley"), an individual who resides at 299 North Saltair Avenue, Los Angeles. These individuals are also plaintiffs in Docket No. 64–378–AAH Civil, along with two other individual plaintiffs who are A. G. Harrold (hereinafter "Harrold"),

an individual who resides at 4920 Dickens Street, North Hollywood, California, and Max B. Elliott (hereinafter "Elliott"), an individual who resides at 1442 Belfast Drive, Los Angeles, California. The counter action in Docket No. 66–1163–AAH Civil was instituted by the United States of America in order to establish alleged income tax deficiencies against each of the corporate defendants and to establish transferee liabilities against each of the individual defendants named therein on various alternative bases.

2. In Docket Nos. 64–377–AAH Civil and 64–378–AAH Civil, jurisdiction is conferred upon this Court by Title 28, U.S.Code, Sections 1340 and 1346(a) (1), in that these are actions to recover Federal income taxes after claims for refund were duly filed and rejected. In Docket No. 66–1163–AAH Civil, jurisdiction is conferred by Title 28, U.S.Code, Sections 1340 and 1345, and by Sections 7401 and 7402 of the Internal Revenue Code of 1954, 26 U.S.Code, Sections 7401 and 7402.

3. Each of the individual plaintiffs in Docket Nos. 64–377–AAH Civil and 64–378–AAH Civil, who are also individual defendants in Docket No. 66–1163–AAH Civil, at all times material hereto was and is an individual, a citizen of the United States, and a resident of the County of Los Angeles, State of California. Each of the corporate defendants in Docket No. 66–1163–AAH Civil is a California corporation.

4. On or about May 28, 1963, the Commissioner of Internal Revenue determined a deficiency in corporate Federal income taxes of Loraine Park Homes (hereinafter "Loraine"), a California corporation, in the amount of $38,798.24 for the taxable period February 1, 1957 to October 15, 1957, it being determined by him that Loraine had additional, unreported taxable income in the amount of $80,347.55. Such determination was erroneous and illegal in all respects.

5. On or about May 28, 1963, the Commissioner of Internal Revenue determined that Cherry and Hadley each was liable, as transferee, for the full deficiency in Federal income taxes determined against Loraine for the period February 1, 1957 to October 15, 1957, in the amount of $38,798.24, together with interest thereon as provided by law. Such determination was erroneous and illegal in all respects.

6. On or about August 27, 1963, Cherry and Hadley each paid to the District Director of Internal Revenue, at Los Angeles, California, the sum of $19,399.-12, with instructions that such amount was to be credited to the principal amount of taxes (and not to interest) of the transferee liability assessed against Cherry and Hadley for the corporate income taxes referred to in paragraph 4 above, of Loraine.

7. The full principal amount of the deficiency in corporate income taxes determined against Loraine has been assessed and fully paid, except for the interest assessed as part of such deficiency.

8. On or about October 21, 1963, Cherry and Hadley each filed with the District Director of Internal Revenue, Los Angeles, California, a claim for refund in the amount of $19,399.12, which claims were erroneously rejected by the Commissioner of Internal Revenue on January 23, 1964, and neither the amount of $19,-399.12, nor any portion thereof has been refunded to either plaintiff.

9. Loraine was organized as a California corporation in October of 1955. All of its issued and outstanding shares of stock (100 shares) were owned equally by Cherry and Hadley. Loraine was engaged in the business of building and selling homes at Glendora, California. It had originally constructed approximately 180 to 190 homes, which sold at prices ranging from $8,000.00 to $9,000.00. Such homes were sold to purchasers under contracts of sale, the purchaser making a small down payment and the balance payable in monthly installments. Loraine reported its income from such sales as ordinary income in its Federal income tax returns on the installment basis.

10. During the latter part of 1956 and early in 1957, Hadley and Cherry had received advice from Irving I. Axelrad,

tax counsel, and from Akeley P. Quirk, general counsel, to the effect that, generally, on a sale of their shares of stock in a corporation they would realize capital gain. They were also advised that if the purchaser of the stock were a corporation, which thereafter liquidated its wholly owned subsidiary, the subsidiary would realize no taxable income on the distribution in liquidation of any of its assets, including installment obligations, to its parent corporation; that the corporation would acquire a new basis for the assets received from the dissolved subsidiary corporation, including installment obligations; and that on any disposition of such installment obligations by the parent corporation, it would realize gain, as ordinary income, to the extent of the difference between its new basis and the amount realized on such disposition.

11. Acting on the advice referred to in paragraph 10, Cherry had various conversations with Arthur E. Neelley (Senior Vice-President of California Federal Savings and Loan Association in charge of the Mortgage Loan Department) regarding the possibility that California Federal would increase the loan balances on the properties still owned by Loraine (which were then approximately 46 in number) to a corporate entity in the event that he and Hadley sold their shares of stock in Loraine to such a corporation. He made it plain to Neelley that he and Hadley intended to sell their shares of stock, if they could, and that Loraine was not attempting to obtain an increase in its own loans. California Federal is one of the largest savings and loan associations and it (including a predecessor organization, known as Standard Federal Savings and Loan) had financed the original construction of the homes built by Loraine and other corporations the stock of which was owned by Cherry and Hadley. Neelley made a so-called "oral commitment", or a statement of intent, to the effect that California Federal would be interested in making such loans subject to the elimination of any title problems or credit risks on the part of any home purchaser whose credit rating might be in question. California Federal by virtue of such oral commitment or statement of intent, did not incur any valid subsisting legal obligation to make any loans. Since California Federal was collecting a lower rate of interest from Loraine than Loraine was collecting from its home purchasers and since California Federal, on such refinancing, would obtain a new higher interest rate (without increasing the interest rate paid by the home buyer) and since California Federal would make various charges, sometimes known as points, for making the refinancing, and since this would diversify the risk of California Federal, Neelley indicated that California Federal would be interested in making such loans. California Federal looked primarily to the security of the property. In discussing the matter with Neelley, Cherry was acting on his own behalf and on behalf of Hadley as stockholders, and not as an officer or director of Loraine, nor on behalf of Loraine.

12. On or about September 24, 1957, Loraine had cash on hand of $84,234.02, of which $82,134.02 was obtained on said date in the following manner:

(a) Beverly Place, Inc., a California corporation, whose stock was owned in equal proportions by Cherry and Hadley, purchased certain lots from Loraine for the sum of $40,000.00.

(b) Hadley-Cherry, Inc., a California corporation, whose stock was owned in equal proportions by Cherry and Hadley, paid off a note payable to Loraine in the amount of $17,500.00.

(c) Cherry and Hadley each paid off a note payable to Loraine, together with interest at 5 percent per annum, the total payment of each being $12,-317.01, or a total of $24,634.02.

13. On or about September 24, 1957, Cherry and Hadley sold and transferred to Hartford Builders, Inc., a California corporation (hereinafter "Hartford"), all of their shares of stock of Loraine for a purchase price of $91,500.00 and Hadley and Cherry warranted that Loraine had net assets of $100,486.96, including an equity of $21,137.94 in the remaining

residential properties sold under contracts of sale. The sale and transfer of the Loraine stock to Hartford was a real, actual, genuine and *bona fide* transaction reflecting the results of an arms' length bargain, and the purchase price for such stock was paid for in full on September 24, 1957. Thereupon, Hadley and Cherry resigned as officers and directors and no longer had any interest in or control over the affairs and business of Loraine.

14. Hartford was, in 1957, a wholly-owned subsidiary of Gunther & Shirley Company, a Nebraska corporation with headquarters in California. Northland Manor Company, a corporation, was a partially owned subsidiary of Gunther & Shirley Company, which owned 66⅔ percent of its stock, the remaining 33⅓ percent of the stock of Northland Manor Company being owned by B. C. Deane, an individual. J. P. Shirley, Jr. was one of the principal stockholders of Gunther & Shirley Company; the other principal shareholders of that corporation were members of Shirley's family. Some or all of these entities were competitors of Cherry and Hadley and their entities.

15. Flower Street Investments, Inc. (hereinafter "Flower Street") was organized as a California corporation on August 28, 1957. At a special meeting of Flower Street's Board of Directors held on August 29, 1957, A. P. Quirk subscribed for 50 shares of its no par value common stock for the price of $500.00 and Irving I. Axelrad and William Hinckle (hereinafter "Hinckle") subscribed for 50 shares of its no par value common stock for the price of $500.00. Axelrad and Hinckle were acting as trustees for their then law partners, as well as for themselves in their individual capacities. Such shares of stock were paid for on October 14, 1957, and constituted all the issued and outstanding shares of Flower Street. Said sum of $1,000.00 represented the total assets of Flower Street on October 14, 1957. Except for the purchase of the stock of Loraine from Hartford, referred to in paragraph 16, Flower Street did no business prior to October 14, 1957. Flower Street was a regularly formed, validly existing, real, actual, genuine, *bona fide* and viable corporate entity whose principal purpose was profit making activity, primarily in the field of real estate investments.

16. Pursuant to a resolution of its Board of Directors on October 14, 1957, Flower Street purchased from Hartford all of the stock of Loraine for a purchase price of $91,500.00; Flower Street gave a demand note for $91,500.00 to Hartford which note was paid by Flower Street, $84,000.00 on October 17, 1957 and $7,500.00 on November 5, 1957. Hartford made the sale to Flower Street because, after acquiring the stock of Loraine, it decided that it preferred not to retain its investment. The sale from Hartford to Flower Street of the stock of Loraine was a real, actual, genuine and *bona fide* transaction reflecting the results of an arms' length bargain and, thereafter, Hartford had no interest in or control over the affairs and business of Loraine. Cherry and Hadley extended the same guaranty regarding the net worth of Loraine to Flower Street that they originally had to Hartford. In acquiring the stock of Loraine, Flower Street did *not* have, as its principal purpose, the evasion or avoidance of Federal income taxes.

17. On October 14, 1957, Flower Street elected to wind up the affairs of Loraine and to voluntarily dissolve it. After complying with all requirements of California law, a certificate of election by Loraine to wind up and dissolve was executed on October 14, 1957 and filed with the Secretary of State of California on October 17, 1957. Pursuant to its plan of liquidation, Loraine transferred to Flower Street, in complete cancellation and redemption of its shares of stock, all of its assets, subject to liabilities. Such assets included title to 46 residential properties, previously sold under contracts of sale and cash in the amount of $88,269.34. At the time of its liquidation, Loraine had deferred and

untaxed income on its installment obligations derived from the sale of houses, in the amount of $80,347.55.

18. Prior to the purchase of the Loraine stock from Hartford, Quirk had made inquiries from Neelley concerning the possibility of refinancing the properties owned by Loraine and the indication was that, subject to title and credit risk checks, he would recommend an increase in loans. After the liquidation of Loraine, Flower Street made due application for an increase in loans on each individual property in an amount equal to the unpaid contract balance owing from the homeowners. Appraisals were made by California Federal and such loans were approved by its Loan Committee. As a consequence, on October 31, 1957, an increased loan was made by California Federal to Flower Street and the proceeds of such loan in the amount of $346,427.64 were used by Flower Street to discharge existing indebtedness to California Federal in the amount of $324,863.20, to which the properties were subject, to pay interest and various loan charges and expenses, and California Federal's check dated October 31, 1957 in the amount of $15,818.69, representing the balance of the loan proceeds was delivered to Flower Street. Contemporaneously, Flower Street executed first deeds of trust, with California Federal as the beneficiary, as to each of the individual properties, to secure an indebtedness on each separate property in an amount equal to the then unpaid purchase price owing from each individual purchaser to Flower Street. Flower Street then delivered grant deeds to each of the contract purchasers of each of the properties who, thereafter, held legal title to the property, subject to the first deeds of trust with California Federal as beneficiary, as described above. Each purchaser was advised to make future payments of principal and interest to California Federal. All of the activities of Flower Street, its officers, directors or stockholders were independently undertaken and were not controlled by nor were they done in any repre-

sentative capacity for Cherry, Hadley or Loraine.

19. Flower Street investigated various real estate properties with a view to the making of investments. On February 7, 1958, Flower Street loaned to British American Pulp & Paper Company the sum of $8,000.00 at 8 percent interest per annum, which was repaid on November 7, 1958. On February 12, 1959, Flower Street purchased 500 shares of the stock of Bandini Petroleum Co., the stock of which was traded on the Pacific Coast Stock Exchange. The price paid by Flower Street, including costs and commissions, was $2,439.00.

20. Flower Street was voluntarily dissolved, and distributed all of its assets, including 500 shares of the capital stock of Bandini Petroleum Co., to its shareholders in cancellation and redemption of their shares of stock. A certificate of election by Flower Street to wind up and dissolve was executed on May 28, 1959 and was filed in the Office of the Secretary of State of California on June 19, 1959.

21. Flower Street correctly reported its taxable income for the period ending August 31, 1958, by allocating the purchase price paid for the shares of stock of Loraine to its tax basis for the properties received on the liquidation of Loraine. It correctly reported ordinary income of $5,572.97 as being realized on the "transfer of title to properties subject to liabilities". On or about May 28, 1963, a delegate of the Secretary of the Treasury determined that there was a deficiency in Federal corporate income taxes of Flower Street in the amount of $35,192.92 for the taxable year ending August 31, 1958, it having been determined that Flower Street had additional, unreported taxable income in the amount of $74,774.58, and notice of said deficiency determination was sent to Flower Street by certified mail, pursuant to the provisions of Section 6212 of the Internal Revenue Code of 1954. Such determinations were illegal and erroneous.

22. Flower Street at no time filed a petition with the Tax Court of the United States for a redetermination of the said deficiency. On or about October 18, 1963 the Internal Revenue Service pursuant to the provisions of Section 6213(c) of the Internal Revenue Code of 1954 duly assessed Flower Street an audit deficiency in the amount of $35,192.92 in tax and $10,402.86 in interest, or an aggregate of $45,595.78 with respect to its taxable year ending August 31, 1958. Such assessment, no part of which was ever paid by Flower Street, was illegal and erroneous.

23. On or about May 28, 1963, the Commissioner of Internal Revenue determined a deficiency in corporate Federal income taxes of Ben Lomond Homes (hereinafter "Ben Lomond"), a California corporation, in the amount of $64,608.79 for the period July 1, 1959 to August 17, 1959, it being determined by him that Ben Lomond had additional, unreported taxable income in the amount of $128,554.88. Such determination was erroneous and illegal in all respects.

24. On or about May 28, 1963, the Commissioner of Internal Revenue determined that Cherry and Hadley each was liable, as transferee, for the full deficiency in Federal income taxes determined against Ben Lomond for the period July 1, 1959 to August 17, 1959, in the amount of $64,608.79, together with interest thereon as provided by law. Such determination was erroneous and illegal in all respects.

25. On or about August 27, 1963, Cherry and Hadley each paid to the District Director of Internal Revenue at Los Angeles, California, the sum of $32,304.39, with instructions that such amount be credited to the principal amount of taxes (and not to interest) of the transferee liability assessed against Cherry and Hadley for the corporate income taxes, referred to in paragraph 23 above, of Ben Lomond, a California corporation.

26. The full principal amount of the deficiency in corporate income taxes determined against Ben Lomond has been assessed and fully paid, except for interest assessed as part of such deficiency.

27. On or about October 21, 1963, Cherry and Hadley each filed with the District Director of Internal Revenue, Los Angeles, California, a claim for refund in the amount of $32,304.39, which claims were erroneously rejected by the Commissioner of Internal Revenue on January 23, 1964, and neither the amount of $32,304.39, nor any portion thereof has been refunded to either Cherry or Hadley.

28. Ben Lomond was organized as a California corporation in July of 1957. All of its issued and outstanding shares of stock were owned equally by Cherry and Hadley. Ben Lomond was engaged in the business of building and selling homes in West Covina, California. It had originally constructed 216 homes which sold at an average price of $7,250.00. Such homes were sold to purchasers under contracts of sale similar to those described in paragraph 9. Ben Lomond reported its income from such sales as ordinary income in its Federal income tax returns on the installment basis. Prior to July 11, 1957, Ben Lomond had operated as a partnership composed of Cherry and Hadley as equal partners. On said date the partnership transferred all of its assets to the corporation in exchange for all of the stock of Ben Lomond Homes, Inc., namely, 50 shares being issued to Cherry and 50 shares being issued to Hadley.

29. During the early part of 1959, Cherry and Neelley had discussions similar to those described in paragraph 11, except that the discussions here related to an increase in loans by a possible corporate purchaser of the stock of Ben Lomond to which Cherry and Hadley hoped to sell such stock. Thereafter, Cherry took steps to ascertain possible title defects and to have Ben Lomond dispose of such properties which Cherry thought that California Federal would not be interested in for increased loans. In discussing the matter with Neelley, Cherry was acting on his own behalf

and on behalf of Hadley as stockholders and not as an officer or director of Ben Lomond, nor on behalf of Ben Lomond.

30. In order to dispose of properties which might not qualify for increased loans and in order to have Ben Lomond in a posture where a potential purchaser would be interested in purchasing its shares of stock, on or about July 29, 1959, Ben Lomond sold to Coast Investment Company (hereinafter "Coast"), a California corporation, whose stock was owned by Cherry, Hadley, Elliott and Harrold, the sales contracts existing as to 12 houses (and the accompanying legal titles applicable thereto) under an agreement whereby Coast assumed the first deeds of trust and other liabilities applicable to such 12 houses, and Coast reduced a note receivable from Ben Lomond by the amount of $20,500.00 representing the differential between the amounts invested by Ben Lomond in said sales contracts and the amounts payable under the first deeds of trust applicable to the properties covered by said sales contracts. On July 30, 1959, Ben Lomond sold to Cherry and Hadley four lots, namely, Tract No. 21755, lots 4, 8, 12, and 13, for a sales price of $71,000.00. In payment for said lots Cherry and Hadley assumed a first deed of trust in the amount of $56,-400.00, and became obligated to Ben Lomond in the amounts of $7,300.00 each. On July 27, 1959, Ben Lomond sold Lot No. 11 to Hadley-Cherry, Inc., a corporation all of whose stock was owned by Hadley and Cherry, for $17,750.00. In payment for said lot the purchaser assumed a first Trust Deed in the amount of $14,100.00 and became liable to Ben Lomond in the amount of $3,-600.00. On July 30, 1959, Ben Lomond sold to Hadley-Cherry, Inc., Lot No. 216 for $6,380.19. In payment for said lot the purchaser assumed a first Trust Deed in the amount of $5,064.69 and became liable to Ben Lomond in the amount of $1,315.50.

31. HAQ Investments, Inc. (hereinafter "HAQ"), was organized as a California corporation on August 4, 1959.

At a special meeting of the Board of Directors of HAQ held on August 12, 1959, Quirk subscribed for 50 shares of its no par value common stock for the price of $500.00, and Axelrad and Hinckle subscribed for 50 shares of its no par value common stock for the price of $500.00. Axelrad and Hinckle were acting as trustees for their then law partners (who held different percentage beneficial interests than they did in Flower Street), as well as for themselves in their individual capacities. Such shares of stock were paid for on various dates between August 21 and August 24, 1959, and constituted all the issued and outstanding shares of HAQ. Except for the purchase of the stock of Ben Lomond from Hadley and Cherry, referred to in paragraph 32, HAQ did no business prior to August 17, 1959. HAQ was a regularly formed, validly existing real, actual, genuine, *bona fide* and viable corporate entity whose principal purpose was profit making activity, primarily in the field of real estate investments.

32. At sometime during June or July, 1959, Cherry and Hadley had negotiated with Axelrad and Quirk regarding a possible sale of the stock in Ben Lomond to a new corporate entity. It was ultimately understood that the transaction would, in substance, follow the pattern set by the prior sale to Hartford. Accordingly, pursuant to a resolution of its Board of Directors, HAQ purchased from Cherry and from Hadley on August 18, 1959, all their shares of stock in Ben Lomond for a purchase price of $175,000.00, which was paid on September 10, 1959. Under the contract of sale, Cherry and Hadley guaranteed that the net assets of Ben Lomond aggregated $194,546.22, the parties agreeing to adjust the purchase price if there were any increase or decrease in such net assets. The sale and transfer of the Ben Lomond stock to HAQ was a real, actual, genuine and *bona fide* transaction reflecting the results of an arms' length bargain, and following the sale of their shares of stock, Cherry and Hadley

resigned as officers and directors and no longer had any interest in or control over the affairs and business of Ben Lomond. In acquiring the stock of Ben Lomond, HAQ did *not* have, as its principal purpose, the evasion or avoidance of Federal income taxes.

33. On August 20, 1959, HAQ elected to wind up the affairs of Ben Lomond and to voluntarily dissolve it. After complying with all requirements of California law, a certificate of election to wind up and dissolve was executed and filed with the Secretary of State of California. Pursuant to its plan of liquidation, Ben Lomond transferred to HAQ, in complete cancellation and redemption of its shares of stock, all of its assets, subject to liabilities. Such assets included title to 143 residential properties, previously sold under contracts of sale, and cash in the amount of $2,573.39. At the time of its liquidation, Ben Lomond had deferred and untaxed income on its installment obligations derived from the sale of houses, in the amount of $128,554.88.

34. Prior to the purchase of the Ben Lomond stock from Cherry and Hadley, Quirk had made inquiries from Neelley concerning the possibility of refinancing the properties owned by Ben Lomond and the indication was that, subject to title and credit risk checks, he would recommend an increase in loans. HAQ made due application for an increase in loans on each individual property in an amount equal to the unpaid contract balance owing from the homeowners. Appraisals were made by California Federal and such loans were approved by its Loan Committee. As a consequence, on September 8, 1959, an increase loan was made by California Federal to HAQ in the amount of $208,832.92, and after deductions for various loan charges and expenses, California Federal's check dated September 8, 1959, in the amount of $195,623.03, representing the balance of the loan proceeds, was delivered to HAQ. Contemporaneously, HAQ executed first deeds of trust, with California Federal as the beneficiary, as to each of the individual properties, to secure an indebtedness on each separate property in an amount equal to the then unpaid purchase price owing from each individual purchaser to HAQ. HAQ then delivered grant deeds to each of the contract purchasers of each of the properties who, thereafter, held legal title to the property, subject to the first deeds of trust with California Federal as beneficiary, as described above. Each purchaser was advised to make future payments of principal and interest to California Federal. All of the activities of HAQ, its officers, directors or stockholders were independently undertaken and were not controlled by nor were they done in any representative capacity for Cherry, Hadley or Ben Lomond.

35. HAQ investigated various real estate properties with a view to the making of investments. On October 7, 1959, HAQ loaned to Quirk the sum of $9,000.00 at 4 percent interest per annum, which was repaid on July 20, 1960. On November 30, 1959 HAQ purchased 100 shares of the stock of City Investing Company for the price of $2,229.25, which stock was sold by HAQ on April 30, 1962 for $2,834.38.

36. On January 10, 1962, the shares of stock of HAQ owned by Axelrad and Hinckle as trustees were redeemed by HAQ for a price of $7,825.85. Thereafter HAQ purchased from Quirk certain improved commercial property on Harbor Boulevard in Costa Mesa, California, for a total purchase price of $27,631.26, HAQ assuming a first trust deed in the amount of $19,982.06 and agreeing to pay to Quirk, in cash, the sum of $4,000.00 on or before February 28, 1962 and the balance of the purchase price as soon as funds were available but no later than May 1, 1965. On January 3, 1963, the same property was sold at its book value to Quirk for a total consideration of $26,089.24, subject to a first trust deed in the amount of $18,869.84. HAQ is still in existence as a dormant corporation.

37. HAQ correctly reported its taxable income for the period ending July 31, 1960, by allocating the purchase price

paid for the stock of Ben Lomond to its tax base for the properties received on the liquidation of Ben Lomond. It correctly reported ordinary income of $21,775.75 as being realized on the transfer of "title to properties subject to liabilities". On or about May 28, 1963, the Internal Revenue Service determined that there was a deficiency in Federal corporate income tax of HAQ in the amount of $54,323.47 for the taxable period August 4, 1959 to July 31, 1960, it having been determined that HAQ had additional unreported taxable income in the amount of $106,779.13, and notice of said deficiency determination was sent to HAQ by certified mail, pursuant to the provisions of Section 6212 of the Internal Revenue Code of 1954. Such determinations were illegal and erroneous.

38. HAQ at no time filed a petition with the Tax Court of the United States for a redetermination of the said deficiency. On or about October 18, 1963, the Internal Revenue Service pursuant to the provisions of Section 6213(c) of the Internal Revenue Code of 1954 duly assessed HAQ an audit deficiency in the amount of $54,323.47 in tax and $9,829.78 in interest, or an aggregate of $64,153.25, with respect to its taxable period August 4, 1959 to July 31, 1960. Such assessment, no part of which was ever paid by HAQ, was illegal and erroneous.

39. On or about May 28, 1963, the Commissioner of Internal Revenue determined a deficiency in corporate Federal income taxes of Coast Investment Company, a California corporation (hereinafter "Coast"), in the amount of $297,385.70 for the taxable period April 1, 1959 to October 20, 1959, it being determined by the Commissioner that Coast had additional unreported taxable income in the amount of $571,895.58. Such determination was erroneous and illegal in all respects.

40. On or about May 28, 1963, the Commissioner determined that Cherry, Hadley, A. G. Harrold (hereinafter "Harrold"), and Max B. Elliott (hereinafter "Elliott") were liable, as transferees, for the respective amounts of $256,000.00, $256,000.00, $64,000.00, and $64,000.00 of the deficiency in Federal income taxes determined against Coast for the period April 1, 1959 to October 20, 1959, together with interest thereon as provided by law. Such determination was erroneous and illegal in all respects.

41. On or about August 27, 1963, Cherry, Hadley, Harrold and Elliott paid to the District Director of Internal Revenue at Los Angeles, California, the respective amounts of $118,954.28, $118,954.28, $29,738.57 and $29,738.57, with instructions that such amounts were to be credited to the principal amount of taxes (and not to interest) of the transferee liabilities asserted against Cherry, Hadley, Harrold and Elliott, for the corporate income taxes of Coast, referred to in paragraph 39 above.

42. The full principal amount of the deficiency in corporate income taxes determined against Coast has been assessed and is fully paid except for interest assessed as part of such deficiency.

43. On or about October 21, 1963, Cherry, Hadley, Harrold and Elliott filed with the District Director of Internal Revenue, Los Angeles, California, claims for refund in the respective amounts of $118,954.28, $118,954.28, $29,738.57 and $29,738.57, which claims were erroneously rejected by the Commissioner on January 23, 1964. None of the amounts claimed as refunds therein nor any portion thereof have been refunded to Cherry, Hadley, Harrold or Elliott.

44. Coast was organized as a California corporation on June 26, 1940. All of its issued and outstanding shares of stock were owned by Cherry (24 shares), Hadley (24 shares), Harrold (6 shares), and Elliott (6 shares). Coast was engaged in the business of building and selling homes in Azusa, California. It had originally constructed approximately 1,200 homes, which sold at prices ranging from $8,000.00 to $9,250.00. Such homes were sold to purchasers under contracts of sale, the purchaser making a small down payment and the balance payable in monthly in-

stallments. Coast reported its income from such sales as ordinary income in its Federal income tax returns on the installment basis.

45. During the Summer of 1959, Cherry and Neelley had discussions similar to those described in paragraph 11, except that the discussions here related to an increase in loans by a possible corporate purchaser of the stock of Coast to which Cherry, Hadley, Elliott and Harrold hoped to sell such stock. Cherry also had a similar discussion with a loan officer of Mutual Savings and Loan Association (hereinafter "Mutual Savings"), Pasadena, California, Mutual Savings having originally financed a few of the homes. Thereafter, Cherry took steps to ascertain possible title defects and to have Coast dispose of such properties which Cherry thought that California Federal or Mutual Savings would not be interested in for increased loans. In discussing the matter with Neelley, and the Mutual Savings officer, Cherry was acting on his own behalf and on behalf of Hadley, Elliott and Harrold as stockholders and not as an officer or director of Coast.

46. In order to dispose of properties which might not qualify for increased loans and in order to have Coast in a posture where a potential purchaser would be interested in purchasing its shares of stock, on or about October 15, 1959, Coast sold:

a. to Coast One O Five, a California corporation, the stock of which was owned equally by Cherry and Hadley, Coast's equity in 91 houses and lots and three Trust Deeds. Coast One O Five assumed Trust Deeds to California Federal of $531,887.48 and delivered its note to Coast in the sum of $45,685.38, the latter amount representing Coast's net equity in such properties.

b. To Coast Three Ten, a California corporation, the stock of which was owned by Harrold, Coast's equity in 12 houses and lots. Coast Three Ten assumed trust deeds to California Federal of $69,709.24 and delivered its note to Coast in the sum of $13,377.89, the latter amount representing Coast's net equity in such properties.

c. To Coast Two Seventy Six, a California corporation, the stock of which was owned by Elliott, Coast's equity in 10 houses and lots. Coast Two Seventy Six assumed trust deeds to California Federal of $78,275.51, and delivered its note to Coast in the sum of $4,733.60, the latter amount representing Coast's net equity in such properties.

47. Alosta Corp. (hereinafter "Alosta") was organized as a California corporation on September 24, 1959. At a special meeting of Alosta's Board of Directors held on October 12, 1959, Alosta was authorized to issue to Quirk 26 shares of Alosta's no par value common stock for the price of $260.00, to Quirk's wife, Helen M. Quirk, 25 shares for the price of $250.00, and to Axelrad, 49 shares for the price of $490.00. Axelrad was acting only in his individual capacity and not as trustee for his law partners. The certificates were dated October 12, 1959, and the shares were paid for on October 19, 1959. These shares constituted all the issued and outstanding shares of stock of Alosta. The sum of $1,000.00 represented the total assets of Alosta on October 19, 1959. Except for the purchase of the stock of Coast from Hadley, Cherry, Elliott and Harrold, referred to in Paragraph 48, Alosta did no business prior to October 20, 1959. Alosta was a regularly formed, validly existing, real, actual, genuine, *bona fide* and viable corporate entity whose principal purpose was profit making activity, primarily in the field of real estate investments.

48. At some time during the consummation of the sale of their stock in Ben Lomond, Cherry and Hadley negotiated with Axelrad and Quirk regarding a possible sale of the stock in Coast to a new corporate entity. It was ultimately understood that the transaction would, in substance, follow the pattern set by the

prior sales to Hartford and to HAQ, and that the purchaser of Coast's stock would be Alosta. Accordingly, pursuant to a resolution of its Board of Directors, Alosta purchased from Cherry, Hadley, Elliott and Harrold on October 20, 1959, all their shares of stock in Coast for a purchase price of $654,000.00 which was later adjusted to $640,000.00. The purchase price was received by Cherry, Hadley, Elliott and Harrold on November 2, 1959, November 10, 1959, and February 11, 1960. Under the contract of sale, Cherry, Hadley, Elliott and Harrold guaranteed that the net assets of Coast aggregated $726,859.19, the parties agreeing to adjust the purchase price if there were any increase or decrease in such net assets. The sale and transfer of the Coast stock to Alosta was a real, actual, genuine and *bona fide* transaction reflecting the results of an arms' length bargain, and following the sale of their shares of stock on October 20, 1959, Cherry, Hadley, Elliott and Harrold resigned as officers and directors and no longer had any interest in or control over the affairs and business of Coast. In acquiring the stock of Coast, Alosta did *not* have, as its principal purpose, the evasion or avoidance of Federal income taxes.

49. On October 20, 1959, Alosta elected to wind up the affairs of Coast and to voluntarily dissolve it. After complying with all requirements of California law, a certificate of election to wind up and dissolve was executed and filed with the Secretary of State of California. Pursuant to its plan of liquidation, Coast transferred to Alosta, in complete cancellation and redemption of all its shares of stock, all of its assets, subject to liabilities. Such assets included title to 596 residential properties, previously sold under contracts of sale, notes receivable of $272,808.94, and cash in the amount of $56,423.34. At the time of its liquidation, Coast had deferred and untaxed income on its installment obligations derived from the sale of houses, in the amount of $571,269.10.

50. Prior to the purchase of the Coast stock from Cherry, Hadley, Elliott and Harrold, Quirk had made inquiries from Neelley concerning the possibility of refinancing the properties owned by Coast and the indication was that, subject to title and credit risk checks, he would recommend an increase in loans. Alosta made due applications to California Federal and to Mutual Savings for an increase in loans on each individual property in an amount equal to the unpaid contract balance owing from the homeowners. Appraisals were made by California Federal and Mutual Savings and such loans were approved by California Federal's Loan Committee and by the authorized officers of Mutual Savings, respectively. As a consequence, on October 29, 1959, November 10, 1959, and December 7, 1959, 584 increased loans were made by California Federal to Alosta aggregating $562,423.63, and after deductions for various loan charges and expenses, California Federal's checks dated October 29, November 10, and December 7, 1959, aggregating $503,932.93 and representing the balance of the loan proceeds, were delivered to Alosta. Similarly, on November 5, 1959, Mutual Savings made 12 increased loans to Alosta and after deducting various loan charges and expenses delivered to Alosta checks aggregating $13,218.74 representing the net loan proceeds. Contemporaneously, Alosta executed first deeds of trust, with California Federal or Mutual Savings as the beneficiary, as to each of the individual properties, to secure an indebtedness on each separate property in an amount equal to the then unpaid purchase price owing from each individual purchaser to Alosta. Alosta then delivered grant deeds to each of the contract purchasers of each of the properties who, thereafter, held legal title to the property, subject to the first deeds of trust with California Federal or Mutual Savings as beneficiary, as described above. Each purchaser was advised to make future payments of principal and interest to California Federal or Mutual Savings. All of the activities of Alosta, its

officers, directors or stockholders were independently undertaken and were not controlled by nor were they done in any representative capacity for Cherry, Hadley, Elliott, Harrold, or Coast.

51. Alosta investigated various real estate properties with a view to the making of investments. On November 30, 1959, Alosta purchased 200 shares of the stock of City Investing Company for the price of $4,458.25, which stock was sold by Alosta on February 1, 1961 for $4,232.94.

52. On or about March 8, 1960, Alosta purchased two ocean front lots in Laguna Beach, California for the sum of $120,000.00, making the down payment of $30,000.00 and executing and delivering the promissory note for the balance of the purchase price payable in annual installments of $22,500.00 per year plus 7 percent interest. Alosta intended to improve such property with an apartment motel. During the next several months it employed three different architects, the last of whom prepared detailed plans and specifications for such construction which were distributed by Alosta to six different contractors for bids. Negotiations were carried on by Alosta for construction loans with lending institutions. The activities of Alosta in this regard became so time consuming and the anticipated expenses of completing the project became so far greater than originally had been anticipated that Axelrad concluded to sell his stock in Alosta to William H. Moran, which he did on or about January 15, 1961, for the selling price of $28,000.00. The purchaser of such stock and Quirk continued as officers and directors of Alosta to plan for the construction of the improvements and also negotiated for the acquisition of adjoining properties. They finally concluded that the cost of construction made the project uneconomic at that time and inasmuch as the project could not be consummated and was to become a long term project, Alosta was liquidated and dissolved during March, 1961. The Laguna Beach property and other assets of the corpora-tion were distributed to its stockholders who were Quirk and the purchaser of Axelrad's stock, William H. Moran. Alosta had expended a total of $48,000.00 in connection with the proposed construction of the apartment project.

53. Alosta correctly reported its taxable income for the period ending November 30, 1959, and for the period ending November 30, 1960, by allocating the purchase price paid for the stock of Coast to its tax base for the properties received on the liquidation of Coast. It correctly reported ordinary income of $28,859.58 and $42,556.40 in its returns for the periods ending November 30, 1959, and November 30, 1960, respectively, as being realized on the "transfer of title to properties subject to liabilities". On or about May 28, 1963, the Internal Revenue Service determined that there were deficiencies in corporate income taxes of Alosta in the amounts of $110,578.94 and $156,718.43 for the taxable periods ending November 30, 1959 and November 30, 1960, respectively, it having been determined that Alosta had additional unreported taxable income for said periods in the amounts of $199,750.95 and $301,381.60 respectively. Notices of said deficiency determinations were sent to Alosta by certified mail pursuant to provisions of Section 6212 of Internal Revenue Code of 1954. Such determinations were illegal and erroneous.

54. Alosta at no time filed a petition with the Tax Court of the United States for a redetermination of either of the said deficiencies in the amounts of $110,578.94 and $156,718.43. On or about October 18, 1963, the Internal Revenue Service pursuant to the provisions of Section 6213(c) of the Internal Revenue Code of 1954, duly assessed Alosta for said deficiencies plus interest of $23,927.74 and $25,152.23 on the respective deficiencies. Such assessments, no part of which was ever paid by Alosta, were illegal and erroneous.

55. At no time did either Loraine, Ben Lomond or Coast ever intend to, negotiate for or in fact make a disposi-

tion of its installment obligations by increasing the loans on the properties which it had sold under contracts of sale and deeding out such properties to the residential homeowners.

56. Except for such collection on its each respective installment obligations which Loraine, Ben Lomond, and Coast had collected from the homeowners, and which it duly reported in its Federal income tax returns, neither Loraine, Ben Lomond nor Coast had made any disposition of its installment obligations during the taxable years in controversy except by disposing of such installment obligations in the course of a real, actual, genuine and *bona fide* liquidation and distributing such installment obligations to its then parent shareholder in complete cancellation and redemption of its shares of stock.

57. The following conclusions of law, insofar as they may be concluded to be findings of fact, are so found by this Court to be true in all respects. From the foregoing facts the Court concludes:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over these consolidated cases and the parties thereto pursuant to the provisions of Title 28, U.S. Code, Sections 1340, 1345 and 1346(a) (1) and pursuant to the provisions of Sections 7401 and 7402 of the Internal Revenue Code of 1954, 26 U.S. Code Sections 7401 and 7402.

2. The liquidation of Loraine Park Homes, and the transfer of all of its assets and property in complete liquidation to Flower Street Investments, Inc., its sole shareholder, pursuant to its plan of liquidation, was a transaction on which no gain or loss was recognized to Flower Street Investments, Inc., under the provisions of Section 332 of the Internal Revenue Code of 1954, as amended, and the distribution of the installment obligations of Loraine Park Homes to Flower Street Investments, Inc., pursuant to such plan of liquidation, was a transaction on which no gain or loss was recognized to Loraine Park Homes by virtue of the provisions of Section 453

(d) (4) (A) of the Internal Revenue Code of 1954, as amended.

3. Loraine Park Homes correctly reported its Federal corporate income tax liability for its taxable period February 1, 1957 to October 15, 1957, and there was no deficiency in its income tax liability for that period.

4. Having made a real, actual, genuine and *bona fide* sale of their shares of stock in Loraine Park Homes on September 24, 1957, neither Cherry nor Hadley was thereafter a stockholder of that corporation and, having thereafter received no assets from that corporation or any successor in interest, except for a real, actual, genuine and *bona fide* full consideration in money or money's worth, neither Hadley nor Cherry is liable for any obligations of Loraine Park Homes incurred subsequent to the sale of their shares of stock and would not be liable, at law or in equity, under Section 6901 of the Internal Revenue Code of 1954, as transferees of the assets of that corporation even if Loraine Park Homes had incurred a subsequent income tax liability.

5. The District Director of Internal Revenue erroneously and illegally collected the sum of $19,399.12 from Ray K. Cherry on August 27, 1963.

6. The District Director of Internal Revenue erroneously and illegally collected the sum of $19,399.12 from John H. Hadley on August 27, 1963.

7. The stepped-up tax basis of the assets of Loraine Park Homes acquired by Flower Street Investments, Inc., is determined under Section 334(b) (2), Internal Revenue Code of 1954. Flower Street Investments, Inc., correctly reported its taxable income for the period ended August 31, 1958 and there is no deficiency in its Federal income tax liability for that period.

8. Neither Hadley nor Cherry is liable as a transferee, at law or in equity, under Section 6901 of the Internal Revenue Code of 1954 for any obligations, including income tax obligations, of Flower Street Investments, Inc.

9. The liquidation of Ben Lomond Homes, Inc., and the transfer of all of its assets and property in complete liquidation of HAQ Investments, Inc., its sole shareholder, pursuant to its plan of liquidation, was a transaction on which no gain or loss was recognized to HAQ. Investments, Inc., under the provisions of Section 332 of the Internal Revenue Code of 1954, as amended, and the distribution of the installment obligations of Ben Lomond Homes, Inc., to HAQ Investments, Inc., pursuant to such plan of liquidation, was a transaction on which no gain or loss was recognized to Ben Lomond Homes, Inc. by virtue of the provisions of Section 453(d) (4) (A) of the Internal Revenue Code of 1954, as amended.

10. Ben Lomond Homes, Inc. correctly reported its corporate income tax liability for its taxable period July 1, 1959 to August 17, 1959, and there was no deficiency in its income tax liability for that period.

11. Having made a real, actual, genuine and *bona fide* sale of their shares of stock in Ben Lomond Homes, Inc., on August 18, 1959, neither Cherry nor Hadley was thereafter a stockholder of that corporation, and, having thereafter received no assets from that corporation or any successor in interest, except for a real, actual, genuine and *bona fide* full consideration in money or money's worth, neither Hadley nor Cherry is liable for any obligations of Ben Lomond Homes, Inc., incurred subsequent to the sale of their shares of stock and would not be liable, at law or in equity, under Section 6901 of the Internal Revenue Code of 1954, as transferees of the assets of that corporation even if Ben Lomond Homes, Inc., had incurred a subsequent income tax liability.

12. The District Director of Internal Revenue erroneously and illegally collected the sum of $32,304.31 from Ray K. Cherry on August 27, 1963.

13. The District Director of Internal Revenue erroneously and illegally collected the sum of $32,304.31 from John H. Hadley on August 27, 1963.

14. The stepped-up tax basis of the assets of Ben Lomond Homes, Inc., acquired by HAQ Investments, Inc., is determined under Section 334(b) (2) of the Internal Revenue Code of 1954. HAQ Investments, Inc., correctly reported its taxable income for the period of August 4, 1959 to July 31, 1960, and there is no deficiency in its Federal income tax liability for that period.

15. Neither Hadley nor Cherry is liable as a transferee, at law or in equity, under Section 6901 of the Internal Revenue Code of 1954 of any obligations, including income tax obligations, of HAQ Investments, Inc.

16. The liquidation of Coast Investment Company, and the transfer of all of its assets and property in complete liquidation to Alosta Corp., its sole shareholder, pursuant to its plan of liquidation, was a transaction on which no gain or loss was recognized to Coast Investment Company, under the provisions of Section 332 of the Internal Revenue Code of 1954, as amended, and the distribution of the installment obligations of Coast Investment Company to Alosta Corp., pursuant to such plan of liquidation, was a transaction on which no gain or loss was recognized to Coast Investment Company, by virtue of the provisions of Section 453(d) (4) (A) of the Internal Revenue Code of 1954.

17. Coast Investment Company correctly reported its Federal corporate income tax liability for its taxable period April 1, 1959 to October 20, 1959, and there was no deficiency in its income tax liability for that period.

18. Having made a real, actual, genuine and *bona fide* sale of their shares of stock in Coast Investment Company on October 20, 1959, neither Cherry, Hadley, Elliott nor Harrold was thereafter a stockholder of that corporation, and, having thereafter received no assets from that corporation or any successor in interest, except for a real, actual, genuine and *bona fide* full consideration in money or money's worth, neither Hadley, Cherry, Elliott nor Har-

rold is liable for any obligations of Coast Investment Company incurred subsequent to the sale of their shares of stock and would not be liable, at law or in equity, under Section 6901 of the Internal Revenue Code of 1954, as transferees of the assets of that corporation even if Coast Investment Company had incurred a subsequent income tax liability.

19. The District Director of Internal Revenue erroneously and illegally collected the sum of $118,954.28 from Ray K. Cherry on August 27, 1963.

20. The District Director of Internal Revenue erroneously and illegally collected the sum of $118,954.28 from John H. Hadley on August 27, 1963.

21. The District Director of Internal Revenue erroneously and illegally collected the sum of $29,738.57 from Max B. Elliott on August 27, 1963.

22. The District Director of Internal Revenue erroneously and illegally collected the sum of $29,738.57 from A. G. Harrold on August 27, 1963.

23. The stepped-up tax basis of the assets of Coast Investment Company acquired by Alosta Corp. is determined under Section 334(b) (2), Internal Revenue Code of 1954. Alosta Corp. correctly reported its taxable income for the period September 18, 1959 to November 30, 1959, and for the year ended November 30, 1960, and there is no deficiency in its Federal income tax liability for those periods.

24. Neither Hadley, Cherry, Elliott nor Harrold is liable as a transferee, at law or in equity, under Section 6901 of the Internal Revenue Code of 1954, for any obligations, including income tax obligations of Alosta Corp.

25. Section 269 of the Internal Revenue Code of 1954 has no application to any of the transactions described in the foregoing Findings of Fact and in these Conclusions of Law.

26. All findings of fact which are actually conclusions of law are hereby incorporated and made a part of these Conclusions of Law.

27. Cherry, Hadley, Elliott and Harrold are entitled to judgment in their favor accordingly, and the United States shall take nothing in these consolidated actions.

Let judgment be entered accordingly.