*Decisions will be entered under Rule 50.*

CROMWELL CORPORATION, ET AL.,[1] PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93889–93891. Filed December 11, 1964.

---

[1] Proceedings of the following petitioners are consolidated herewith: The Cornwell Quality Tools Co., docket No. 93890; and The Cornwell Quality Tools Co., Transferee, docket No. 93891.

# 314

*Leo J. Schwartz* and *Julian L. Berman*, for the petitioners.
*John L. Pedrick* and *Jerry M. Reinsdorf*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in income tax for the fiscal year ending September 30, 1957, in the following amounts:

| Docket No. | Petitioner | Amount |
|---|---|---|
| 93889 | Cromwell Corp_ | $270,888.81 |
| 93890 | The Cornwell Quality Tools Co_ | 61,449.00 |
| 93891 | The Cornwell Quality Tools Co., Transferee of Kennedy Service Tools Co.[1] | 4,732.17 |

[1] Transferee liability in docket No. 93891 is not contested except insofar as the merits of the transferor's liability are involved.

Petitioners filed a consolidated return for the entire fiscal year ended September 30, 1957, with the district director of internal revenue, Chicago, Ill., although they claim to have been affiliated only for the period from August 1 to September 30, 1957. The parties are agreed that separate returns should have been filed for the 10 months prior to August 1, 1957, and that the failure to do so resulted in an overpayment because of the higher tax rate applicable to consolidated returns. Petitioners have claimed an overpayment in the amount of such erroneously computed tax.

The issue presented for decision is whether respondent erred in determining that petitioners were not entitled to file a consolidated return because the formation of Cromwell Corp. and its acquisition of the capital stock of the Cornwell Quality Tools Co. were acquisitions of control of a corporation for the principal purpose of avoiding Federal income tax by securing the benefit of a deduction, credit, or other allowance which would not otherwise have been enjoyed.

### FINDINGS OF FACT

The stipulated facts are so found, and are incorporated herein by this reference.

Cromwell Corp. (hereinafter sometimes referred to as Cromwell) is an Illinois corporation incorporated on July 8, 1957. The stockholders of record of Cromwell (hereinafter sometimes referred to as the principals) and their percentage interest at its inception and during the period here involved were as follows:

| Stockholder | Number of shares | Percentage |
|---|---|---|
| Raymond H. C. Moeller | 500 | 25 |
| Nathan M. Cohn | 500 | 25 |
| Gordon, Inc | 500 | 25 |
| David J. Zimring [1] | 500 | 25 |

[1] Zimring held 85 percent of the 25-percent interest as the nominee of Standard Acceptance Co., a partnership, and held the remaining 15 percent as nominee of Herbert Zavis. The partnership of Standard Acceptance Co. was composed of the following persons with the following percentage interests:

|  | *Percent* |
|---|---|
| David Zimring | 50 |
| Fannie Kanes | 25 |
| Herbert Zavis | 12½ |
| Dorothy Kanes | 12½ |

The Cornwell Quality Tools Co. (hereinafter sometimes referred to as Cornwell) and the Kennedy Service Tools Co. (sometimes hereinafter referred to as Kennedy) are Ohio corporations, incorporated on November 14, 1919, and August 27, 1936, respectively, with their principal place of business at Modagore, Ohio. During 1957 and 1958 Cornwell owned all the outstanding stock of Kennedy; it is the transferee of Kennedy's assets and is liable for any deficiency attributed to Kennedy.

During 1957, one or more of the principals, on behalf of a corporation to be formed, commenced negotiations for the purchase of Cornwell, a corporation profitably engaged in the tool-manufacturing business. These negotiations culminated in the execution of a contract on June 25, 1957, between Cornwell and Raymond H. C. Moeller (hereinafter sometimes referred to as Moeller) who was acting in behalf of a corporation to be formed. This contract provided for the sale of Cornwell's assets for $660,000 plus a guarantee by the buyer that the selling shareholders would receive an anticipated $40,000 income tax refund.

Prior to the execution of the June 25, 1957, contract, the principals negotiated with the First National Bank of Akron (sometimes hereinafter referred to as the bank) to arrange for a $400,000 loan to finance the purchase of Cornwell. This loan was to be secured by Cornwell's assets and guaranteed by the principals. On July 2, 1957, the bank approved this loan. On July 8, 1957, Cromwell was incorporated. Each of the principals provided $50,000 as a capital contribution and made a loan of $40,000 to the corporation.

Initial negotiations between Moeller and Cornwell were for the purchase of Cornwell's stock, but when Moeller was unable to get the selling shareholders' agreement to indemnify the buyers against any undisclosed liabilities of Cornwell, the contract of sale was changed to provide for a purchase of Cornwell's assets rather than its stock. Thereafter, the shareholders of Cornwell agreed to indemnify the buyers. The agreement of June 25, 1957, was canceled by mutual consent and, on July 15, 1957, Moeller, as nominee for Cromwell, made a written offer to purchase all of Cornwell's stock for $700,000, and deposited $25,000 with the bank as earnest money. This offer was accepted on July 22, 1957. To finance the purchase, Cromwell borrowed $400,000 from the bank on July 23, 1957, repayment of which was to be made on or before August 1, 1957. This temporary loan was guaranteed by the principals. This borrowing was made with the understanding that when Cromwell acquired the Cornwell stock on August 1, 1957, Cornwell would borrow $400,000 from the bank, secured by a mortgage on its fixed assets, and would pay a $400,000 dividend to Cromwell which Cromwell would use to pay off its July 23, 1957, obligation to the bank.

The principals viewed the stock purchase as more desirable than an asset purchase, since Cornwell had a good business reputation, existing contracts with dealers, suppliers, and labor unions, and a good credit rating. They formed Cromwell as a parent company to make the acquisition in order to provide a base of operations for future acquisitions of other businesses and investments, and to insure a continuity in such operations. The principals negotiated for the acquisition of other businesses both before and after the purchase of Cornwell.

On August 1, 1957, the sale of stock to Cromwell was consummated and Cromwell became the sole stockholder of Cornwell. On August 1, 1957, Cornwell borrowed $400,000 from the bank secured by mortgages on its assets, and guaranteed by the principals. This borrowing was evidenced by two notes, one in the amount of $150,000 and another in the amount of $250,000. The $150,000 note was secured by a mortgage on certain real property of Cornwell and the $250,000 note was secured by a chattel mortgage on certain of Cornwell's personal property. The former note was paid in full on November 19, 1958; the latter note was paid in full on June 1, 1960. On August 1, 1957, Cornwell paid Cromwell a dividend of $400,000 which Cromwell then used to pay off its loan from the bank. On August 1, 1957, Cornwell had accumulated earnings and profits exceeding $400,000.

From its inception, and during the period herein involved, the principals were the officers and directors of Cromwell. On August 1, 1957, they were elected as officers of Cornwell, and were the sole directors of Cornwell during the period herein involved. On August 2, 1957, Charles M. Zust, who had been president of Cornwell before the purchase, was elected president in place of Moeller, who was elected executive vice president.

The consolidated return filed by petitioners included all the income of Cromwell, Cornwell, and Kennedy for the fiscal year ended September 30, 1957. The return disclosed the receipt of the intercompany dividend of $400,000 paid by Cornwell to Cromwell but such intercompany dividend was excluded in computing the consolidated income.

Respondent determined that under section 269 of the 1954 Code,[2] the petitioners either (1) "should be denied the privilege of filing a consolidated Federal income tax return" or (2) were not entitled to eliminate the $400,000 intercompany dividend or to receive the 85-percent dividends-received deduction provided for by section 243(a).

Cromwell was a legal business entity formed for a bona fide business purpose.

The method employed by the principals to finance the acquisition of Cornwell was neither a sham nor a subterfuge.

---

[2] All Code references are to the Internal Revenue Code of 1954 unless otherwise stated.

The formation of Cromwell and its acquisition of Cornwell's stock did not enable the principals to secure the benefit of a deduction, credit, or other allowance which they would not otherwise have enjoyed.

Cromwell, Cornwell, and Kennedy were members of an affiliated group and were entitled to the privilege of filing a consolidated return in which the $400,000 intercompany dividend was properly eliminated.

### OPINION

It is respondent's contention that the formation of Cromwell and its acquisition of Cornwell were acquisitions of control of corporations for the principal purpose of avoiding income taxes by securing the benefit of a deduction, credit, or other allowance which would not otherwise have been enjoyed, and comes within the purview of section 269 (a).[3] Respondent has accordingly disallowed to the petitioners the privilege of filing a consolidated return and contends that Cromwell is taxable on the $400,000 dividend from Cornwell. Respondent contends that "the benefit sought was the distribution of a tax-free dividend from Cornwell; the deduction, credit, or allowance which was to produce the benefit was the elimination of inter company dividends in a consolidated return."

Petitioners maintain that they were entitled to file a consolidated return and to compute their tax liabilities on a consolidated return basis. They urge that Cromwell was formed principally for valid business purposes rather than for tax avoidance, and also that the course of action pursued did not result in securing a benefit not otherwise obtainable since similar methods of acquisition have been approved by the courts. Further, petitioners contend that the use of a new corporation, such as Cromwell, to acquire the stock of a going business is a conventional business practice, that petitioners meet all of the requirements for filing a consolidated return, and that section 269 cannot deprive petitioners of the privilege of filing a consolidated return under the facts in the instant case.

We agree with petitioners. We rest our decision upon the ground that, irrespective of purpose, there has been no securing of a benefit which would not otherwise have been enjoyed.

---

[3] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(a) In General.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *

The operation of section 269 requires the presence of (1) an acquisition of control of a corporation, (2) with the principal purpose of avoiding Federal income tax, (3) by securing the benefit of a deduction, credit, or other allowance which would not otherwise be enjoyed. It is not disputed by petitioners that the formation of a corporation (Cromwell) constitutes an acquisition for purposes of section 269. The parties have presented evidence on principal purpose, but we find it unnecessary to decide this question. In our opinion, respondent's contentions must fall because the third requisite has not been met: There has been no benefit secured which would not otherwise have been enjoyed.

The fundamental facts of the instant case, putting aside the question of purpose, are as follows: The principals desired to acquire Cornwell. To this end, they formed Cromwell, which obtained a temporary $400,000 loan from the bank, to be secured by Cornwell's assets and guaranteed by the principals, and acquired all of the Cornwell stock. After the acquisition, Cornwell obtained a new $400,000 loan from the bank, secured again by Cornwell's assets and guaranteed by the principals, paid a $400,000 dividend to Cromwell, and Cromwell repaid its loan. Filing a consolidated return, the corporation eliminated this dividend from their consolidated net income.[4]

The result of the above transactions was that the assets of Cornwell became primarily liable on the loan, and the principals had, in effect, financed in part the acquisition of Cornwell with funds other than their own. Respondent classifies this as a tax-free dividend to the principals, while petitioners refer to it as an acquisition, with a limited investment, which could have been effected by several alternative methods. We agree with petitioners that the use of purchased assets to finance part of the purchase price need not result in the imposition of a tax.

In *Arthur J. Kobacker*, 37 T.C. 882 (1962), acq. 1964–2 C.B. 6, the petitioner was unable to raise a sufficient amount of cash to purchase all of a department store's stock for $475,000. He set up an investment company to which he, his wife, and a trust for his daughter contributed $175,000 in exchange for all of the stock. Other relatives advanced $177,500 and received debentures, and petitioner's uncle advanced $125,000 in return for the investment company's promissory note. Petitioner assigned his contract to purchase the department store to the investment company, which consummated the stock purchase. A little more than a year later the investment company was merged into the department store corporation. The surviving corporation issued stock and executed a note to petitioner's uncle which was identical to the original note given by the investment company.

---

[4] There is no argument by respondent that petitioners do not satisfy the mechanical requirements of sec. 1.1502–31(b)(2)(ii), Income Tax Regs., providing for the elimination of dividends received from members of the affiliated group.

Petitioner was the guarantor of both notes. The corporation paid off the new note in 1954 and 1955 and respondent determined that the payments were constructive dividends to petitioner. We rejected this determination, finding that there was no sham or subterfuge in the transactions, that the loans to the investment company were not in reality loans to petitioner, and that the surviving corporation had not paid a liability of petitioner in repaying the loan from petitioner's uncle. We accepted petitioner's contentions that the investment company was the entity which in fact engaged in the transactions involved; that this "was a basically nontaxable transaction, namely, buying into a corporation simultaneously with complete retirement of its old shareholders"; and that petitioner, his wife and daughter's trust invested $175,000 and got what they paid for: $175,000 worth of equity in the department store corporation's stock. We stated, at page 895:

For the $175,000 which they paid for the stock of Alfred, petitioners acquired no more than an equity in Reiner's subject to its indebtedness. Thus, the value of the interest in Reiner's which petitioners acquired was tailored to meet the size of their pocketbook. The method employed was not a sham or subterfuge but one petitioners had a legal right to employ to avoid the *incurrence* of tax liability which might have resulted had they personally borrowed the money, used it to buy the stock of Reiner's, and later caused Reiner's to pay such indebtedness. The later merger of Alfred into Reiner's resulted in no greater economic benefit to petitioners, aside from operational savings. Their interest in Reiner's was still subject to the indebtedness incurred by Alfred and assumed by Reiner's. To be sure, their stock might become more valuable as the indebtedness was paid off and the corporation was able to pay greater dividends, but such appreciation in the value of their stock would not be taxable to petitioners until they sold or otherwise disposed of such stock.

In *Milton F. Priester*, 38 T.C. 316 (1962), the petitioner became the sole shareholder of a corporation by having a third party purchase the majority interest from petitioner's brother's widow and then having the corporation redeem and cancel these shares. We held, after finding that the third party was not a "straw man," that petitioner did not receive a constructive dividend from the redemption. That petitioner had contracted to, and did, vote his shares in favor of the redemption and that his shares may have appreciated in value because he became the sole remaining shareholder were insufficient to establish a constructive dividend to him since he received no financial or economic value from the transaction. Relying on the opinions of the Courts of Appeals in *Holsey* v. *Commissioner*, 258 F. 2d 865 (C.A. 3, 1958), reversing 28 T.C. 962 (1957), and *Niederkrome* v. *Commissioner*, 266 F. 2d 238 (C.A. 9, 1958), reversing a Memorandum Opinion of this Court, we decided that any appreciation in the value of petitioner's stock due to the redemption was to be taxed not as a constructive dividend at the time of the redemption, but as a gain on a subsequent sale of his stock.

In addition to the above cases, petitioners cite *Ray Edenfield*, 19 T.C. 13 (1952), and *Zenz* v. *Quinlivan*, 213 F. 2d 914 (C.A. 6, 1954), to illustrate other alternatives open to the principals in achieving the same tax result as they hoped to achieve by use of a consolidated return. Respondent argues that even if there were "a method which could have been employed to achieve their desired result, * * * they should not be permitted to escape the consequences of the method they chose." This contention misconceives the nature of the instant inquiry.

Ordinarily, a taxpayer may arrange his affairs so as to minimize his tax liabilities by means which the law permits. *United States* v. *Isham*, 84 U.S. 496 (1873); *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950); *Commissioner* v. *Tower*, 327 U.S. 280 (1946). Section 269, however, provides the Commissioner with a weapon to attack acquisitions where a taxpayer secures the benefit of a credit, deduction, or other allowance which he would otherwise not enjoy. The transaction is then recast to reflect what the taxpayer's tax liability would have been if the prohibited acquisition had taken a different form. Thus, the third element of section 269 requires an examination of the alternatives available to the taxpayers. Petitioners contend, and we agree, that since the benefits received would have been enjoyed by means of the suggested alternatives, section 269 does not proscribe the use of a consolidated return. Viewed separately, petitioners' use of a consolidated return does not contravene any specific section of the Code. When viewed together with the alternatives available to petitioners, it does not contravene section 269.

The basic purpose of section 269 is to prevent the distortion of a taxpayer's net income. *Commodores Point Terminal Corporation*, 11 T.C. 411, 415–416 (1948); *Coastal Oil Storage Co.* v. *Commissioner*, 242 F. 2d 396, 399–400 (C.A. 4, 1957), reversing in part 25 T.C. 1304 (1956); *Zanesville Investment Co.* v. *Commissioner*, 335 F. 2d 507 (C.A. 6, 1964), reversing 38 T.C. 406 (1962); sec. 1.269–2(b), Income Tax Regs. The use of a consolidated return by the petitioners does not distort their net income. The net effect of the transactions which respondent attacks is to substitute Cornwell for Cromwell as primary obligor on the bank loan. The petitioners, taken as a business entity, have received no net income from the transactions; the principals have received nothing from the elimination of the intercorporate dividend which they would not have otherwise enjoyed by use of an alternative route.

We are not involved with the usual section 269 situation where a taxpayer is attempting to secure the benefit of built-in tax advantages, typically a net operating loss carryover, by combining two corporations via an acquisition. Cases such as *J. D. & A. B. Spreckels*

*Co.*, 41 B.T.A. 370 (1940); *Elko Realty Co.*, 29 T.C. 1012 (1958), affd. 260 F. 2d 949 (C.A. 3, 1958); *R. P. Collins & Co.* v. *United States*, 303 F. 2d 142 (C.A. 1, 1962); and *David's Specialty Shops* v. *Johnson*, 131 F. Supp. 458 (S.D.N.Y. 1955); which involved the denial of the use of consolidated returns to secure such built-in benefits, are not applicable to the instant case for that reason, and also because we have found as a fact that there were bona fide business purposes in the formation of Cromwell and its acquisition of Cornwell. Cf. *United States* v. *Northern Railroad*, 334 F. 2d 936 (C.A. 1, 1964); *Joseph Weidenhoff, Inc.*, 32 T.C. 1222 (1959); and *Zanesville Investment Co.* v. *Commissioner, supra*. The formation of a holding company to acquire another corporation is not an unusual procedure and is not a "device" which would distort the income of petitioners or of the principals in the instant case, as comprehended by section 269. See S. Rept. No. 627, 78th Cong., 1st Sess., p. 58, 1944 C.B. 1016.

Respondent, on brief, states that his "position is that the four principals sought to obtain an otherwise unavailable benefit when they caused the formation of Cromwell Corporation. The benefit sought was the distribution of a tax-free dividend from Cornwell; the deduction, credit, or allowance which was to produce the benefit was the elimination of intercompany dividends in a consolidated return." We believe that respondent has mischaracterized the situation. If the above statement is intended to suggest that the principals were in receipt of a tax-free dividend, it is incorrect; if intended to refer to Cromwell's receipt of the dividend, it is correct, but there has been no distortion of income within the intendment of section 269. The principals have received no dividend from Cromwell and have not been relieved of their liability as guarantors of the loan taken out by Cromwell and now in effect assumed by Cornwell. Their equity in Cornwell has been decreased by the $400,000 loan which Cornwell has incurred as a liability. See *Arthur J. Kobacker, supra*, and *Milton F. Priester, supra*.

Respondent contends that Cromwell would not have been formed "but for the apparent opportunity to finance the acquisition of Cornwell by withdrawing its accumulated earnings and profits without incurring the tax which would have resulted if the principals had purchased the stock and received the dividend themselves." We think it reasonable to assume that the principals would not have caused the distribution by Cornwell of a $400,000 dividend if they had held its stock directly rather than indirectly through their ownership of Cromwell, since they would have had to pay individual income tax on the dividend before being able to apply it toward repayment of the original bank loan. This, however, does not support respondent's use of a "but for" test and characterization of the transactions as the receipt of a tax-free dividend. The transactions must be viewed to-

gether. The formation of Cromwell was not a sham, but was an integral part of the acquisition of Cornwell with a limited equity. Cf. *Arthur J. Kobacker, supra.* The use of a consolidated return was another ingredient in the acquisition. The election by the petitioners to file a consolidated return did not distort the "true net income of the enterprise as a whole," and did not contravene the statutory purpose underlying the consolidated return provisions. See S. Rept. No. 665, 72d Cong., 1st Sess., p. 9 (1932), 1939–1 C.B. (Part 2) 503. The choice by taxpayers to use a consolidated return almost presupposes that their income taxes would be reduced in spite of the additional 2-percent tax imposed by section 1503 for the privilege of filing a consolidated return.[5] Respondent's isolation of petitioners' use of a consolidated return as a tax-avoidance technique proscribed by section 269 is improper; it must be viewed as part of the entire set of transactions. Section 269 refers to securing the benefit of a deduction, credit, or other allowance which such person would not otherwise enjoy. It does not use a "but for" test of whether or not the taxpayer would secure the same benefit if the questioned "deduction, credit, or other allowance" were eliminated from the transactions. Certainly if the only change in the transactions were that Cromwell was never formed, the principals would be liable for a tax on the dividend paid to them as shareholders of Cornwell. However, it is utterly implausible that the principals would have chosen to follow such a course in acquiring Cornwell. Rather, they would have employed one of the alternative methods discussed above. We are persuaded that such alternatives were completely feasible and since the benefits sought herein would have been enjoyed, section 269, by its very terms, is inapplicable. See also *John F. Nutt,* 39 T.C. 231, 250 (1962), on appeal (C.A. 9, July 11, 1963).

For the reasons stated above, respondent's alternative positions under section 269, namely, that petitioners were not entitled to eliminate the intercompany dividend or to receive the 85-percent dividends-received deduction, are also without merit.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

[5] This additional tax has been repealed for taxable years beginning after Dec. 31, 1963, by Pub. L. 88–272, sec. 234(a).