**SUPREME INVESTMENT CORPORATION, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 71–2819.**

United States Court of Appeals, Fifth Circuit.

Oct. 2, 1972.

---

Jerome J. Reso, Jr., New Orleans, La., Robert L. Curry, III, Monroe, La., for plaintiff-appellant.

Donald E. Walter, U. S. Atty., Robert H. Shemwell, Shreveport, La., Fred B. Ugast, Acting Asst. Atty. Gen., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, David E. Carmack, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WISDOM, GODBOLD and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

In this action the taxpayer, Supreme Investment Corporation, sued for a refund of $852 in federal income taxes for the fiscal year ended November 30, 1965, allegedly erroneously and illegally assessed.[1] The case involves the interaction of § 269 and §§ 332, 334(b)(2) and 381(a)(1) of the 1954 Internal Revenue Code.[2] We hold that the Commissioner

---

1. Resolution of the issues will ultimately affect the taxability of $83,000 of income.

2. Section 269(a), at issue here, reads as follows:
 (a) In general.—If—
 (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
 (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled directly or indirectly, immediately before such acquisition, by such acquiring cor-

overstepped the bounds of § 269 in assessing the tax in this case, and accordingly we reverse the district court's holding in the Government's favor, 320 F.Supp. 1328.

Supreme Investment Corporation (Supreme), originally incorporated in 1959, is a Louisiana corporation domiciled and doing business in Ouachita Parish, Louisiana. Until February 17, 1965, Supreme's 87½ outstanding shares of stock were owned solely by R. D. Kellogg. On that date R. D. Kellogg sold to his attorneys, Thomas W. Leigh and Robert L. Curry, ten shares each of his Supreme stock at $250 per share. On February 22, 1965, Supreme redeemed 57½ shares of stock from R. D. Kellogg, so that its remaining thirty shares of stock were equally divided among Kellogg, Curry, and Leigh. Then, on February 26, 1965, Supreme purchased from Robert L. Kellogg, the son of R. D. Kellogg, all the shares of CKS Corporation (CKS). CKS was a Louisiana corporation, originally incorporated in 1953, which, like Supreme, was domiciled and doing business in Ouachita Parish.

Supreme elected to liquidate CKS, its wholly owned subsidiary, on April 19, 1965. Certain assets of CKS, including a promissory note dated July 31, 1956, and drawn by Star Motel, Inc. (the predecessor of CKS) to the order of CKS, were transferred under date of April 26, 1965 to Supreme in consideration for Supreme's surrender of its CKS stock and its assumption of certain liabilities due and owing by CKS. As part of this transaction, the taxpayer assumed a $125,000 note payable to R. D. Kellogg by his son, Robert Kellogg. CKS had been reporting its gain on the Star Motel note, which had a principal amount of $400,000 with 4 percent interest per annum until paid, on the installment method authorized by § 453 of the Internal Revenue Code, whereby the gain realized is recognized ratably over the period of collections upon the note.

At the heart of this controversy is a dispute over the basis Supreme should properly assign to the Star Motel installment obligation. Supreme determined its basis for the Star Motel note by reference to its allocable cost for the CKS stock, together with the liabilities which it assumed from CKS, arriving at a figure of $204,235.37. The Commissioner determined that, instead of using a cost basis, Supreme should have carried over the same basis for the note as it had in the hands of CKS. The basis of the note in the hands of CKS was $121,639.-80. Consequently the Commissioner assessed a deficiency against Supreme in the amount of $852 for its taxable fiscal year ending November 30, 1965, representing the tax allegedly due on amounts Supreme received in part payment of the Star Motel note plus interest. After its claim for a refund was denied, Supreme brought suit in district court. The district court held in favor of the Commissioner, concluding that Supreme should have used a carryover rather than a cost basis.

On this appeal Supreme contends that it is compelled by §§ 332,[3] 334(b)(2),[4]

poration or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock pos-

sessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

3. SEC. 332. Complete liquidations of subsidiaries.
 (a) General rule.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.

4. SEC. 334. Basis of property received in liquidations.

and 381[5] of the Internal Revenue Code to determine its basis in the installment obligation by reference to its allocable cost for CKS stock. The Government counters by asserting that the transaction in question was nothing more than a tax avoidance scheme and that § 269 therefore requires Supreme to use the lower basis, regardless of the rules laid down in other sections of the Code. Tax avoidance would result from the fact that under § 453(d)(4), as then applicable,[6] CKS would not recognize any gain on distribution of the installment obligation in liquidation. If Supreme were permitted to use its cost basis, $83,000 higher than CKS's basis, that $83,000 of income would ultimately escape taxation altogether. The Government stresses the attorney-client and fa-

* * * * *

(b) Liquidation of subsidiary.—

* * * * *

(2) Exception.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12 month period beginning with the earlier of—

* * * * *

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

* * * * *

5. SEC. 381. Carryovers in certain corporate acquisitions.

(a) General rule.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2) . . ..

* * * * *

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

* * * * *

(c) Items of the distributor or transferor corporation.—

* * * * *

(8) Installment method.—If the acquiring corporation acquires installment obligations (the income from which the distributor or transferor corporation has elected, under section 453, to report on the installment basis) the acquiring corporation shall, for purposes of section 453, be treated as if it were the distributor or transferor corporation.

6. As applicable at the time of the transaction in this case, § 453 read as follows: SEC. 453. Installment method.

* * * * *

(d) Gain or loss on disposition of installment obligations—

* * * * *

(4) Effect of distribution in certain liquidations.—

(A) Liquidations to which section 332 applies.—If—

(i) an installment obligation is distributed by one corporation to another corporation in the course of a liquidation, and

(ii) under section 332 (relating to complete liquidations of subsidiaries) no gain or loss with respect to the receipt of such obligation is recognized in the case of the distributing corporation, then no gain or loss with respect to the distribution of such obligation shall be recognized in the case of the distributing corporation . . ..

* * * * *

ther-son relationships among the principals and the careful consideration given to tax consequences in structuring this transaction. The Government maintains that the principal purpose of the acquisition and liquidation of CKS was to obtain this tax benefit and that therefore § 269 operates to deny the claimed tax benefit. Even if § 269 does not apply, the Government further argues that the same result is mandated by § 1001(d) and by general principles of taxation. Supreme denies that the principal purpose of the transaction was tax avoidance, alleging instead that its principal purpose was to acquire a leasehold interest owned by CKS.[7] Supreme further argues that § 269 is inapplicable on its face, regardless of the purpose of the transaction.

The district court held that § 269 was broad enough to apply to the facts of this case, and went on to find that Supreme's "principal purpose" in acquiring and liquidating CKS was tax avoidance. Since we hold that § 269 is inapplicable, we do not reach the district court's findings of fact.

I.

■ The predecessor to § 269 was § 129 of the 1939 Code, enacted in the Revenue Act of 1943, 58 Stat. 47 (1934). Its prime aim was to discourage corporations with large excess profits from the practice of trading in loss corporations or corporations with excess profits tax credits as a means of tax avoidance. See 7 Mertens, Law of Federal Income Taxation § 38.65 (1967); Rudick, Acquisitions to Avoid Income or Excess Profits Tax: Section 129 of the Internal

Revenue Code, 58 Harv.L.Rev. 196 (1944); Peter Pan Seafoods, Inc. v. United States, 9 Cir.1969, 417 F.2d 670, 674; S.Rep. No. 627, 78th Cong., 1st Sess. 58 (1944), 1944 Cum.Bull. 1016; Zanesville Investment Co. v. Commissioner of Internal Revenue, 6 Cir.1964, 335 F.2d 507, 509. Both its language and legislative history suggest that it was intended to reach a wide variety of tax avoidance schemes. Section 269 was not designed to enumerate any one particular type of tax avoidance device, but rather was intended to condemn such devices "in whatever form they may appear." H.R.Rep. No. 871, 78th Cong., 1st Sess.(1943), 1944 Cum.Bull. 973, 1017. See Borge v. Commissioner of Internal Revenue, 2d Cir.1968, 405 F.2d 673, 678, cert. denied sub nom. Danica Enterprises, Inc. v. Commissioner of Internal Revenue, 1969, 395 U.S. 933, 89 S.Ct. 1994, 23 L.Ed.2d 448. The Commissioner has taken a broad view of the section's scope. Thus the Regulations define "allowance" under § 269 to include "anything in the internal revenue laws which has the effect of diminishing tax liability."[8] Treas.Reg. § 1.269–1(a) (1962). See also 7 Mertens § 38.66; James Realty Co. v. United States, 8 Cir.1960, 280 F.2d 394.

■■ In view of the apparently deliberate breadth of the language of § 269 we do not think that a mechanical reading of the section can resolve the issues before us. As this Court said in Bobsee Corp. v. United States, 5 Cir. 1969, 411 F.2d 231, 234: "[W]hatever else may be said of this provision, its applicability or inapplicability is certain-

---

7. The leasehold interest was an asset of CKS. CKS was paying a rental of $700 a month on the property, which it was subleasing for a total rental of $1300 per month. After its acquisition of CKS Supreme was able to negotiate more favorable terms for the lease. But both sublessees failed to renew their leases, one in 1967 and the other in 1968, and Supreme was unable to find tenants to replace them.

8. Courts hav sometimes taken a narrower view of the reach of this language. Thus the Tax Court has suggested that nonrecognition does not come within the scope of the terms "deduction, credit, or other allowance." Bijou Park Properties, Inc., 1966, 47 T.C. 207, 214, acquiesced in, 1968–2 Cum.Bull. 1. See also Sam Siegel, 1966, 45 T.C. 566, acquiesced in, 1966–2 Cum.Bull. 7; John F. Nutt, 1962, 39 T.C. 231, acquiesced in, 1964–1 Cum.Bull. (Part 1) 5.

ly not revealed by a mere reading of the statutory language." [9]

■■ Our rejection of a mechanical, literal approach to § 269 does not mean that we think that § 269 is broad enough to reach the facts of this case. Section 269 was not intended to condemn every acquisition resulting in a tax saving. Zanesville Investment Co. v. Commissioner of Internal Revenue, 6 Cir. 1964, 335 F.2d 507, 510. We think that § 269 must be read in light of the other provisions of the Internal Revenue Code which it was designed to supplement. The Senate Finance Committee Report accompanying § 129 of the 1939 Code made clear that the section was to be read with a view to Congressional policies embodied in specific deductions or exemptions. The test whether § 129 was applicable to a given transaction was that stated in Higgins v. Smith, 1940, 308 U.S. 473, 60 S.Ct. 355, 84 L. Ed. 406: "whether the transaction or a particular factor thereof 'distorts the liability of the particular taxpayer' when the 'essential nature' of the transaction or factor is examined in the light of the 'legislative plan' which the deduction or credit is intended to effectuate." S.Rep. No. 627, 78th Cong., 1st Sess. (1943),

1944 Cum.Bull. 1016, 1017. A similar statement has been embodied in the Regulations. Treas.Reg. § 1.269–2(b) (1962). There is no tax avoidance, in other words, and no occasion for applying § 269, when a taxpayer determines its tax liability in accordance with the rules specified by Congress, and pays the tax Congress intended it should pay.

Thus § 269 has been held inapplicable to deny taxpayers certain tax benefits which Congress plainly intended that they should enjoy. The Commissioner ruled that creation of a "Western Hemisphere trade corporation" under § 109 of the 1939 Code [10] was not tax avoidance within the meaning of § 129 of the 1939 Code, even though done for the principal purpose of obtaining tax savings, since the tax benefit was consistent with the Congressional plan. I.T. 3757, 1945 Cum.Bull. 200. In A. P. Green Export Co. v. United States, 1960, 284 F.2d 383, 151 Ct.Cl. 628, the Court of Claims reaffirmed the Commissioner's ruling. In Alinco Life Ins. Co. v. United States, 1967, 373 F.2d 336, 178 Ct.Cl. 813, the Court of Claims doubted that § 269 would be applicable to deny tax credits granted by § 801 of the Code to companies qualifying as life insurance compa-

9. We are thus unpersuaded by Supreme's argument that § 269 on its face can apply only to deny allowances, credits or deductions which were somehow possessed by the acquired corporation and transferable to the acquiring corporation. Indeed, courts have frequently held that § 269 is applicable regardless of whether the deduction, credit or allowance producing the tax benefit was possessed by the acquiring corporation or the acquired corporation. See, e. g., F. C. Publication Liquidating Corp. v. Commissioner of Internal Revenue, 2 Cir. 1962, 304 F.2d 779; Thomas E. Snyder Sons Co. v. Commissioner, 7 Cir. 1961, 288 F.2d 36, cert. denied, 1961, 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 28; Commissioner of Internal Revenue v. British Motor Car Distributors, Ltd., 9 Cir. 1960, 278 F.2d 392. Nor are we impressed with Supreme's apparent attempt to deny that it obtained any tax benefit whatever in this transaction, on the ground that it was merely using its own cost as a basis rather than any deduction, credit or allowance ob-

tained from CKS. We think that the tax saving resulting from the combined benefits of nonrecognition to CKS and a stepped-up basis for Supreme may be considered as inuring to Supreme, the sole owner of CKS. See Bobsee Corp. v. United States, 5 Cir. 1969, 411 F.2d 231, 234; Coastal Oil Storage Co. v. Commissioner of Internal Revenue, 4 Cir. 1957, 242 F.2d 396, 399. The tax benefit in cases such as this is not necessarily commensurate with the difference between a stepped-up basis and a carryover basis. Allocation of cost to installment obligations means that there will be less cost to allocate to determine the basis of any other assets acquired. See Horn, Taxation of Installment and Deferred Payment Sales, 1960 Tulane Tax Inst. 618, 635. Here, however, the other assets of CKS were of slight value by comparison with the Star Motel note, and the decrease in their basis would thus not be significant.

10. Now § 921 of the 1954 Code.

nies, finding a Congressional intent to confer the benefits regardless of the taxpayer's purpose. 373 F.2d at 345.

We think that the web of statutory provisions governing this particular transaction prevents the Commissioner from using § 269 to make an exception to the cost basis rule of § 334(b)(2). Congress has given thorough and detailed attention to the problems encountered in distributions of installment obligations in corporate liquidations. Section 337 specifically includes installment obligations within the definition of the term "property". Section 336 specifically excepts installment obligations from its general rules for determining gain or loss, referring to the special rules of § 453(d). At the time of the transaction in this case, § 453(d)(4) specifically exempted the distributing corporation— here CKS—from recognition of gain with respect to installment obligations. Congress drew careful lines which admit of no exceptions. See Bijou Park Properties, Inc., 1966, 47 T.C. 207, 214–215, acquiesced in, 1968–2 Cum.Bull. 1.

■ With respect to the receiving corporation, the position of Supreme in this case, the statutory rules are even clearer. The liquidation of CKS met all the requirements of § 334(b)(2). Section 334(b)(2) is a codification of principles derived from the decision in Kimbell-Diamond Milling Co., 1950, 14 T.C. 74, aff'd per curiam, 5 Cir.1951, 187 F. 2d 718, cert. denied, 1951, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626. See S.Rep. No. 1622, 83rd Cong., 2d Sess. 257 (1954). The *Kimbell-Diamond* case held that a purchase of a corporation's stock in order to obtain its assets should be treated as a direct purchase of the assets, with the consequence that the cost of the stock should serve as the basis for the assets. In codifying the *Kimbell-*

*Diamond* rule Congress made a major change: it substituted a series of objective tests in place of a determination of the taxpayer's subjective intent to obtain corporate assets. Section 334(b)(2) is therefore a mandatory rather than an elective provision, and it may apply even in cases where the taxpayer's intent is not to obtain the underlying assets of a corporation but to purchase and maintain the corporate structure. See Rev.Rul. 60–262, 1960–2 Cum.Bull. 114; Kansas Sand and Concrete Inc., 1971, 56 T.C. 522, 1971; United States v. M.O.J. Corp., 5 Cir.1960, 274 F.2d 713. The express requirements of § 334(b)(2) are, moreover, reinforced by § 381(a)(1), which explicitly denies to the receiving corporation in a § 334(b)(2) liquidation the use of certain carryovers, including the carryover basis on installment obligations otherwise permitted by § 381(c)(8).

■ We think that the mandatory and objective provisions of § 334(b)(2), buttressed by 381(a)(1), as applied to this case leave no room for the Commissioner to insert § 269 to require Supreme to use a carryover basis. To require Supreme to run the gantlet of § 269 would be to reintroduce into § 334(b)(2) the always troublesome and volatile element of subjective intent which Congress sought to eliminate. Our conclusion that Supreme correctly used its allocable cost for CKS stock as its basis is reinforced by the amendment to § 453(d)(4)(A), enacted by § 202(c) of the Foreign Investors Tax Act, P.L. 89–809, 80 Stat. 1539 (1966). Section 453(d)(4)(A) as amended provides that a corporation distributing an installment obligation in a § 332 liquidation will be entitled to nonrecognition only when the receiving corporation determines its basis under § 334(b)(1).[11] Thus gain

---

11. Section 453(d)(4)(A) as amended reads as follows:

(4) Effect of distribution in certain liquidations.—

(A) Liquidations to which section 332 applies.—If—

(i) an installment obligation is distributed in a liquidation to which section 332 (relating to complete liquidations of subsidiaries) applies, and

(ii) the basis of such obligation in the hands of the distributee is determined under section 334(b)(1),

would be recognized to the distributing corporation where, as here, the receiving corporation determines its basis under § 334(b)(2). It is significant that this amendment was made to operate only prospectively.[12] This is further evidence that Congress did not intend to disturb the tax benefit which Supreme obtained; had Congress intended to impose a tax on this transaction, it probably would have made the amendment retrospective. See Cherry v. United States, 1967, C.D. Cal., 264 F.Supp. 969, 980. Moreover, in foreclosing for the future any escape of installment obligations from taxation in § 332 liquidations, Congress imposed a tax on the liquidating subsidiary, rather than requiring the receiving parent corporation to use the subsidiary's basis. Had the liquidation of CKS occurred after the amendment to § 453(d)(4)(A), then, CKS, not Supreme, would have paid the tax which the Government here seeks to impose on Supreme. Supreme would still have been required to take a cost basis. Thus Congress carefully preserved intact the rules of § 334(b)(2) for determining basis. The Government in this case does not appear to have attempted to assess any tax against CKS for the distribution of the installment obligation. But it does not follow, in view of what we have said, that § 334(b)(2) should be ignored and Supreme required to pay the tax.

Our decision is consistent with the holdings of other courts which have faced similar questions. In Cherry v. United States, 1967, C.D.Cal., 264 F.Supp. 969, the court, confronting essentially the same problem we confront here, held § 269 inapplicable since it found no principal purpose of tax avoidance. The court went on, however, in a lengthy dictum to

suggest that § 269 would have been inapplicable regardless of purpose, reasoning that the terms "deduction, credit, or other allowance" did not include nonrecognition [13] and that the stepup in basis was a benefit otherwise obtainable under the rule of Cromwell Corp., 1964, 43 T.C. 313.

In Blueberry Land Co. v. Commissioner of Internal Revenue, 5 Cir.1966, 361 F.2d 93, we affirmed a Tax Court holding that two distributing corporations were taxable on the subsequent sale of installment obligations after liquidation. It was held there that the acquisition and liquidation were shams, and that these steps could therefore be disregarded and the whole transaction considered a sale by the distributing corporations. See Commissioner of Internal Revenue, v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. But *Blueberry* is distinguishable from the case before us. There the intermediate parent corporation was a mere shell, with only $202 in capitalization, and negotiations for a sale of assets had been carried out well before the course of acquisition and liquidation was adopted. Thus in substance the transaction did not come within the provisions of § 332. But, as this Court said in *Blueberry*, "each case must be decided on its own merits by examining the form and substance of the transaction and the purpose of the relevant tax provisions to determine whether recognition of the form of the transaction would defeat the statutory purpose." 361 F.2d at 101. Here no question is raised as to the viability of either Supreme or CKS, or as to the bona fides of any of the shareholders.[14] We

then no gain or loss with respect to the distribution of such obligation shall be recognized by the distributing corporation.

12. The relevant transactions in this case took place in 1965, and thus the amendment to § 453(d)(4)(A) is inapplicable here. The amendment was made applicable by § 202(d) of the Foreign Investors Tax Act, P.L. 89–809, 80 Stat.

1539 (1966), only to distributions taking place after Nov. 13, 1966.

13. We do not hold here that a stepup in basis cannot constitute a deduction, credit, or other allowance within the meaning of § 269.

14. The Commissioner in originally assessing a deficiency against Supreme asserted that Curry and Leigh were not bona

think that there has been full compliance with § 332 and § 334(b)(2).

The Tax Court in Bijou Park Properties, Inc., 1966, 47 T.C. 207, acquiesced in, 1968–2 Cum.Bull. 1, held that the receiving parent corporation in that case was required to use the distributing corporation's basis. This holding was based on a finding that one of the shareholders of the parent corporation was not a bona fide shareholder. This resulted in the applicability of the attribution provisions of § 318(a). Consequently § 334(b)(3) came into play,[15] and § 334(b)(2) could not apply since therefore there was no "purchase" as required by § 334(b)(2)(B). Section 334(b)(3) cannot apply in the present case, however, since by stipulation the parties have agreed that all shareholders in fact owned the shares of stock they purported to own, and no argument is made that the attribution provisions of § 318(a) are otherwise applicable.

## II.

 The Government further argues that, despite Supreme's literal compliance with § 334(b)(2), Supreme is required to use a carryover basis even if § 269 is inapplicable. As support for this contention, the Government first advances the fundamental principle of taxation that whenever gain is not recognized on an exchange of property, the transferee must carry over the transferor's basis to prevent any gain from escaping tax. We do not think that this general rule can be permitted to override a specific statutory exception. It is true that a carryover basis is usually a concomitant of nonrecognition. See 3A Mertens § 21.02. But it is also true that a transferee is only required to use the transferor's basis when the transaction falls squarely within a statutory provision requiring a carryover basis; otherwise the transferee may use its cost as a basis. See, e.g., Citizens Fidelity Bank and Trust Co., 1956 P.H Tax Ct.Mem.Dec. ¶ 56,162, dismissed on stipulation, 6 Cir.1957, 245 F.2d 243. Moreover, while it may be a general rule that a carryover basis accompanies nonrecognition, it is by no means a universal rule. A taxpayer acquiring property from a decedent under § 1014 takes not the decedent's basis but, instead, a basis equal to the fair market value of the property at the time of death. Finally, we must remember that Congress, not the courts, bears the responsibility for establishing the rules of taxation. In deriving governing principles the courts must look to what Congress has done, as long as Congress has acted within its powers. We are not prepared to employ broad principles to frustrate specific statutory language. See Dorba Homes, Inc. v. Commissioner of Internal Revenue, 2 Cir.1968, 403 F.2d 502, 506. For similar reasons we are unpersuaded by the Government's further contention that permitting Supreme to use an allocable cost basis would subvert the general principles of installment accounting.

The Government also contended below that the provisions of § 1001(d) of the Code forbid application of § 334(b)(2) in this case. The district court did not reach this issue, since it disposed of the case under § 269. The Government renews this contention on appeal. We reject it.

Section 1001(d) provides:

Nothing in this section shall be construed to prevent (in the case of prop-

---

fide shareholders but were mere nominees of R. D. Kellogg. The government apparently abandoned this theory before trial, and the pretrial stipulation states that Supreme's stock was owned one-third by Curry, one-third by Leigh, and one-third by R. D. Kellogg. Stipulations ¶ 5(f).

15. Section 334(b)(3)(C) is as follows:
 * * * * *

(3) Purchase defined.—For purposes of paragraph (2)(B), the term "purchase" means any acquisition of stock, but only if—
 * * * * *
(C) the stock is not acquired from a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock.

erty sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received.

Section 1001(a) establishes the rules for computation of gain or loss on a "sale or other disposition" of property. Gain is to be the amount realized less the adjusted basis provided in § 1011. For determining the adjusted basis § 1011 refers in turn to § 1012, which states that basis shall be cost "except as otherwise provided in this subchapter or subchapter C." Supreme seeks to determine its adjusted basis by referring to § 334(b)(2) in subchapter C. The Government contends that the "adjusted basis" referred to in § 1001(a) cannot be determined by § 334(b)(2) through this chain of references, since to do this would be to read § 1001 in such a way as to prevent "the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received," in contravention of § 1001(d).

On its face, however, § 1001(d) does not establish rules for the computation of basis, but rather makes an exception to the general rule of § 1001 that gain is taxable in the year of sale. See 2 Mertens § 15.01 & n. 2. Nor do we find any warrant in the legislative history of § 1001(d) for reading it broadly to prohibit the application of § 334(b)(2) to this transaction. Section 1001(d) was originally adopted as § 202(f) of the Revenue Act of 1921, c. 136, 42 Stat. 227. The purpose of this section was explained in the Conference Report:

The amendment also provides that nothing in the section relating to the basis for determining gain or loss

shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing profit in the year in which the payment is received.

H.Rep. No. 486, 67th Cong., 1st Sess. 18 (1924), 1939–1 Cum.Bull. (Part 2) 210. This may likewise be read to indicate a Congressional purpose simply to except installment obligations from the usual rule that gain, representing the excess of the amount realized over the adjusted basis, will be taxed in the year of sale.

This reading is supported by the legislative history of subsequent amendments to § 202 of the 1921 Act, which indicates that the principal purpose of that section was to accord recognition to the right to report income on the installment basis, a right not theretofore recognized by the tax laws. See S.Rep. No. 52, 69th Cong., 1st Sess. 19 (1925), 1939–1 Cum.Bull. (Part 2) 346–47; H. Rep. No. 356, 69th Cong., 1st Sess. 32 (1926), 1939–1 Cum.Bull. (Part 2) 363. Moreover, if the purpose of the predecessor of § 1001(d) was to ensure that all "profit" on installment obligations would be taxed, Supreme arguably will have made no "profit" on its installment obligation until it receives income in excess of its allocable cost.

Finally, we think that the action of Congress in amending § 453(d)(4)(A) to tax the distributing corporation on installment obligations in a § 334(b)(2) liquidation prevents us from giving § 1001(d) the broad reading which the Government urges. If Congress had thought that § 1001(d) operated to impose a tax in every such case, it would have thought it unnecessary to amend § 453(d)(4)(A) to ensure that a tax was assessed.[16] If we read § 1001(d) as the

---

16. Conceivably, even if it had been clear that § 1001(d) would result in the imposition of tax on the receving corporation, Congress might have enacted the amendment to § 453(d)(4)(A) solely in order to shift the liability for tax from

the receiving corporation to the distributing corporation. The legislative history of this amendment is clear, however, that Congress did not understand the receiving corporation to be liable to pay tax in every case. Instead, the provision was

Government suggests, in other words, the amendment to § 453(d)(4)(A) would be rendered redundant. Such a result would be contrary to the well-established principle of statutory construction that, where another interpretation is permissible, courts will not construe a statute to make it redundant, absent a clear legislative purpose to the contrary. See Singer v. United States, 1945, 323 U.S. 338, 65 S.Ct. 282, 89 L.Ed. 285. We therefore conclude that the slender statutory reed of § 1001(d) cannot bear the weight which the Government seeks to place on it.

In sum, we hold that the taxpayer, Supreme, could use the cost of the CKS stock in determining its basis for the assets received upon liquidation of CKS, in accordance with Sections 332, 334(b)(2) and 381(a)(1) of the Internal Revenue Code of 1954.

The judgment of the district court is reversed.

enacted to prevent the permanent escape of gain from taxation. See S.Rep.No. 1707, 89th Cong., 2d Sess. 60–61 (1966),

3 U.S.Code Cong. & Admin.News, pp. 4446, 4506–07 (1966).